*In re* A.T. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Pam Daniels, Respondent-Appellant).

Fourth District   No. 4—89—0483

Opinion filed May 17, 1990.

STEIGMANN, J., specially concurring.

Robert K. Adrian, of Pollock, Ennis & Heck, of Quincy, for appellant.

Scott H. Walden, State's Attorney, of Quincy (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE KNECHT delivered the opinion of the court:

Pamela Daniels, respondent, appeals the trial court order terminating parental rights for her two minor children, A.T. and R.T. Parental rights were also terminated for the minors' father, Richard Turner. Turner does not join respondent in this appeal. We affirm.

On June 24, 1985, the Adams County State's Attorney filed petitions against respondent alleging neglect of her one-year-old son, R.T. and neglect and abuse of her two-year-old daughter, A.T. The petition alleging neglect of R.T. cited sexual abuse of R.T.'s sister, physical abuse of R.T. by respondent's boyfriend, and inadequate and improper housing. The petition alleging neglect and abuse of A.T. stated on or about May 22, 1985, A.T. was sexually abused by her uncle, Kenneth Forbis, who was at the time a member of the household. Forbis engaged A.T. in anal and oral intercourse, and A.T. contracted oral gonorrhea and experienced vaginal bleeding. Respondent had left A.T. with Forbis on several occasions, knowing Forbis to be an improper caretaker. At the shelter care hearing, the trial court found the peti-

tions to be supported by probable cause and temporary custody of the children was given to the Illinois Department of Children and Family Services (DCFS).

On June 30, 1985, an amended petition for adjudication of wardship was filed. Both petitions alleged R.T. and A.T. were neglected and abused. Count I of the amended petitions recited the allegations made in the original petitions. Count II of both petitions alleged respondent had not provided proper and necessary care for the minors' well being in that she had lived at six different addresses within the past several months and had placed the minors with different relatives during this period of time. Additionally, the minors had not received adequate food, clothing, or shelter when in residence with respondent. On July 30, 1985, respondent admitted the allegations of count II of the petitions and the court found the minors to be neglected.

A dispositional hearing was held on August 30, 1985. The court adjudged the minors neglected as to proper or necessary support, education as required by law, or as to medical or other remedial care recognized under State law, or other care as necessary for their well being, including adequate food, clothing, and shelter. The court found respondent unable and unfit to care for the minors. The court appointed DCFS guardian of A.T. and R.T. and ordered respondent to attend and complete the day program at the community counseling center. A.T. and R.T. were placed together in a foster home in which they have remained throughout all these proceedings.

A series of review hearings followed on December 6, 1985, January 17, 1986, March 21, 1986, September 23, 1986, March 10, 1987, September 18, 1987, April 25, 1988, and October 17, 1988. Additionally, DCFS provided the court with periodic reports of respondent's progress. On February 21, 1989, a petition for termination of parental rights was filed. The petition alleged respondent was an unfit parent for failure to make reasonable efforts to correct the conditions which were the basis for removal of her children, and for failure to make reasonable progress toward return of the children within 12 months of adjudication.

A hearing was held on the petition to terminate parental rights on June 2, 1989. The court found respondent to be unfit based upon her failure to make reasonable efforts to correct the conditions which were the basis for removal of her children, and to make reasonable progress toward the return of the children within 12 months after adjudication. The court terminated respondent's parental rights and gave DCFS the power to consent to adoption of the minors. Respond-

ent now appeals, alleging (1) the trial court's termination of respondent's parental rights was against the manifest weight of the evidence; (2) the trial court erred in determining what progress respondent had made only up to 12 months after the date of adjudication; (3) the trial court erred in admitting evidence of an indicated report against respondent concerning abuse of another child; (4) the trial court erred in making a finding of unfitness when it was not provided with transcripts from the earlier hearings; and (5) the trial court erred in considering all prior reports made by DCFS.

Initially, this court pays deference to the importance of parental rights. Our courts have recognized parental rights and responsibilities are of deep human importance, and thus will not be lightly terminated. (*In re Paul* (1984), 101 Ill. 2d 345, 461 N.E.2d 983; *In re Hoback* (1981), 95 Ill. App. 3d 169, 419 N.E.2d 713.) A finding of parental unfitness required to terminate parental rights must be supported by clear and convincing evidence. (*In re Brown* (1981), 86 Ill. 2d 147, 427 N.E.2d 84.) However, such deference does not negate our responsibility to protect minors from neglect and abuse.

The termination of parental rights is governed by the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1987, ch. 37, par. 801—1 *et seq.*) and the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501 *et seq.*). Under these acts, a finding of unfitness may lead to termination of parental rights. The court may take such action after finding it to be in the best interests of the minors. (Ill. Rev. Stat. 1987, ch. 37, par. 802—29.) A finding of unfitness can result from failure by the parent to make reasonable efforts to correct conditions which were the basis for removal of the child, or from failure to make reasonable progress toward the return of the child within 12 months after adjudication. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) Reasonable progress requires measurable movement toward the goal of returning the child. Whether a small amount of progress is reasonable must be determined with proper regard for the best interest of the child. *In re Edmonds* (1980), 85 Ill. App. 3d 229, 406 N.E.2d 231.

At the termination hearing, Barbara Bernett testified for the State. Bernett has been the child-welfare specialist assigned to this case since its inception. In this capacity, she assisted in formulating a service plan for respondent designed to improve respondent's parenting ability. The plan provided respondent was to obtain and maintain employment; obtain and maintain safe and clean housing suitable for the children; attend counseling and follow the advice of the counselor; attend scheduled visitations with the children; refrain from physically or sexually abusing the children and not allow anyone else to abuse

them; provide proper care, supervision, and discipline for the children during visitation; abide by city, State, and Federal laws; submit to random urine toxicology screening for alcohol and other substances; and maintain stability in her life, particularly her choice of male companions. Respondent's progress was evaluated every six months.

Bernett testified regarding the conditions which precipitated removing the children from respondent's home and how these conditions related to the requirements of the service plan. Bernett testified respondent had made progress on some of the tasks set out in the service plan, but then tended to regress. Respondent had made little or no effort to obtain and maintain a job. Respondent worked for a very short period of time before quitting her job at the Swift-Eckrich Company in 1986 and 1987, and again at the Ayerco gasoline station in Camp Point in January 1988. Respondent had also worked two days as a waitress at Larry's Restaurant in January 1988 before quitting that job. Although respondent had a hysterectomy in September 1985 and gallbladder surgery in May 1987, her physical health did not preclude her from working.

From June 1985 through August 1988, respondent had lived in 10 different residences in Adams County which were suitable for visitation with the children. One or two of the homes would not have been large enough had the children been living with her. In February 1986, respondent began cohabiting with Russell Daniels and his three-year-old son, S.D. Daniels' daughter, A.D., began living with them in the summer of 1987. Respondent and Daniels moved to Camp Point in August 1987, which created problems as all the social services provided to them were centered in Quincy. Respondent and Daniels married in March 1988.

After respondent became involved with Daniels, additional conditions were written into the service plan requiring Daniels to participate in parenting classes with respondent. While respondent had already attended parenting classes, it was determined she needed a review, particularly because she was experiencing difficulty controlling her and Daniels' children during visitation. Respondent and Daniels attended 2 or 3 out of 16 classes before quitting, reportedly because of transportation problems. DCFS would have reimbursed them for mileage. Respondent received a certificate for parenting because DCFS agreed to combine her attendance from the first set of classes with the second set.

In January 1986, respondent was referred to the community counseling center. Out of 14 appointments scheduled for her between January and June 1986, respondent missed or cancelled 10. The center

closed her case in July 1986 due to her lack of cooperation. In September 1986, respondent voluntarily admitted herself into the psychiatric ward of St. Mary's Hospital for an evaluation. She left after three days and before the evaluation was completed. A stress team which assessed respondent's case in December 1987 recommended DCFS exercise great caution before returning the children to her.

Respondent resumed counseling at the community counseling center from April 1987 to September 1988. At this time counseling was ended due to respondent's conviction for unlawful delivery of a controlled substance, lysergic acid diethylamide (LSD). This offense was committed in April or May 1987. Respondent was convicted on September 30, 1988, and sentenced to three years' imprisonment. While in prison, respondent's service plan was amended to require respondent to attend counseling in prison, abide by prison regulations, show interest in the children, and participate in visitation with the children at prison. Respondent met these revised goals.

In her capacity as child-welfare specialist for this case, Bernett also prepared dispositional reports which were periodically filed with the court. The court took judicial notice of these reports in making its determination to terminate respondent's parental rights. The reports included additional information regarding respondent's progress and elaborated upon Bernett's testimony. Respondent was divorced from Richard Turner in the fall of 1984, and began living with Aaron Van Herron. Van Herron was diagnosed as being paranoid schizophrenic with a lengthy history of violence toward others. Despite Van Herron's admission of having an uncontrollable temper, respondent allowed him to discipline her children. Even after the removal of the children, respondent continued her relationship with Van Herron. Respondent reported her relationship with Van Herron ended in December 1985; by mid-February 1986, respondent had begun living with Russell Daniels and his three-year-old son.

DCFS arranged weekly two- to three-hour visits between respondent and the children. The visits were supervised by a homemaker. Respondent did not devote this time exclusively to the children and frequently was distracted by friends who called on the telephone or visited. Respondent also used this time for chores, including doing laundry for her boyfriend and requesting the homemaker to watch the children while she returned a rental car. The children were frequently unruly during visitation with respondent, particularly when Daniels and S.D. were present. Daniels antagonized the children and S.D. was a bad influence because he was disruptive. Respondent exacerbated the situation by tickling the children, who often vomited during or af-

ter the visits. Respondent was overwhelmed when the children misbehaved and was unable to correct their behavior.

Russell Daniels pleaded guilty to unlawful possession of cannabis on September 9, 1986, and was assessed by recovery resources as a chronic alcoholic with dependency on marijuana and amphetamines. Daniels was described as hostile and unpredictable when under the influence of alcohol and drugs. He was on probation for driving under the influence, his second conviction for the offense, when arrested on the new charge.

With regard to respondent's own conviction for unlawful delivery of a controlled substance (LSD), respondent advised Bernett she sold drugs because she needed money to pay a fine assessed against Daniels in a criminal case. Respondent did not appreciate how her sale of drugs adversely affected her efforts to regain custody of the children.

Dr. Robert A. Karp, a psychiatrist, also testified for the State at the termination hearing. Dr. Karp testified regarding psychiatric evaluations he made of respondent and A.T. Pursuant to a request by DCFS, Dr. Karp evaluated respondent to ascertain her mental status as it related to her ability to function as a mother. Between October and December 1986, he interviewed respondent on seven occasions for approximately 45 minutes to an hour. Based on these interviews, Karp concluded respondent suffered from borderline personality disorder, an emotional disorder marked by unstableness of mood, self-image, and relationships. The social history respondent related to Karp revealed a pattern of maladaptive behaviors, which fit seven out of the eight salient characteristics of the disorder. The features of the disorder respondent manifested in the interviews were (1) a history of unstable interpersonal relationships; (2) loss of impulse control; (3) instability of mood and affect; (4) formation of premature, intimate relationships with members of the opposite sex; (5) chronic feelings of emptiness and boredom; (6) fear of abandonment and dependence on others; and (7) history of passivity.

Karp testified this combination of personality traits impacted negatively on respondent's ability to be a responsible mother to her children. Her fear of abandonment and dependence upon men outweighed her concern for her children. Respondent had recounted to him a series of liaisons with unstable men, some of whom she knew were abusing the children. She related incidents when Van Herron severely beat A.T., then age two, for having a bowel movement in her pants, and hit R.T. about the face. Respondent was unable to explain why she did nothing to intervene on her children's behalf or how she would thwart such abuse in the future. Karp testified every aspect of

respondent's life was chaotic and disorganized. She formed attachments to a succession of men, some of whom she had only known for a matter of hours, made impulsive and erratic moves from one residence to another, experienced mood swings which negatively affected her ability to maintain a job and relationship, and sought inappropriate types of stimulation to counteract boredom.

Karp testified borderline personality disorder is amenable to treatment, but that respondent's prognosis for recovery was guarded unless she was generally motivated to change and consistently participate in therapy for several years. Though respondent expressed a desire to reform, Karp questioned the sincerity of this statement, particularly because respondent had not voluntarily sought this advice.

On September 5, 1986, Dr. Karp evaluated A.T. to determine whether she had been sexually abused and was developmentally impaired. Karp first reviewed a history of A.T. provided by the Quincy Community Counseling Center. The report indicated a significant delay in A.T.'s development of language skills. Based upon A.T.'s conduct during this 90-minute interview and play session, Karp reached the following conclusions: (1) A.T.'s sexual precociousness was indicative she had been molested or witnessed adult sexual relations; (2) her physical aggressiveness suggested she was the victim of physical aggression or witnessed major chaotic physical struggles between respondent and another; (3) there was no constant father figure in A.T.'s life; (4) A.T. was possibly functioning in the borderline intelligence level; and (5) her developmental language disorder and regressive behavior suggested she suffered a pervasive early developmental trauma such as physical abuse, neglect, and lack of nurturing.

Respondent testified on her own behalf regarding her rehabilitative efforts since incarceration. Respondent claimed she was an exemplary inmate. She was on work release from the Peoria Correctional Center, working as a maid at the Holiday Inn approximately 40 hours a week and as a waitress at a restaurant for about 20 hours a week. Approximately 20% of her earnings were spent for room and board at the Peoria Correctional Center. The remainder of her earnings were placed in savings, or were used to pay outstanding bills or to buy gifts for her children. Every week she attends drug-abuse counseling, which is a mandatory condition of her sentence. Maxine Eldridge, respondent's mother, testified she had noticed a change in respondent following her arrest on the drug charges. Respondent is less moody and no longer apathetic.

■ On appeal, a court will not reverse a finding of unfitness unless it is against the manifest weight of the evidence. The trial court's

opportunity to view and evaluate the parties and their testimony is far superior to that of the reviewing court. Accordingly, the trial court's findings should be given great deference. *In re Brown*, 86 Ill. 2d at 152, 427 N.E.2d at 87; *In re Wright* (1986), 142 Ill. App. 3d 809, 492 N.E.2d 252.

■ Respondent was given both time and opportunity to make reasonable progress and efforts. Respondent failed and the trial court was required to act. The trial court was justified in terminating parental rights, considering respondent's failure to make efforts, to achieve meaningful progress, and the best interests of the children. The trial court's order terminating parental rights of respondent is not against the manifest weight of the evidence.

Respondent further contends the trial court erred in only considering the progress respondent had made up to 12 months after the date of adjudication. In alleging the trial court only considered the 12 months immediately following adjudication of neglect, respondent cites the trial court's written order entered June 7, 1989, which provides: "2. Mother has failed to make reasonable progress toward return of children within 12 months following adjudication of neglect on August 29, 1985." Respondent further cites an excerpt from the termination proceedings, which provided:

"Q. [By prosecutor]: And you have been a caseworker for this family: A.T., R.T., and their mother?

A. Yes. I have. Since January of '84, I have been acquainted with the family.

Q. And January of 84, would have been when the case first arose?

A. Yes, Pam called the [DCFS] in January of '84 inquiring about—

[Respondent's Counsel]: Judge, I'm going to object to anything that happened before the petition was filed. I believe we are concerned here with the allegations of the petitioner to terminate as to progress that has been made and what has happened after the children have been removed from Pam's custody, so therefore, I am objecting to any testimony concerning what happened prior to the date of the petition for adjudication was filed. I believe that is irrelevant to what has happened since then.

THE COURT: Mrs. Rodriguez?

[Assistant State's Attorney]: Your Honor, I believe that any indicated reports and history that the [DCFS] has involving this family is relevant to the overall picture of whether or not there

has been any progress made in this case.

THE COURT: Anything else, [Assistant State's Attorney]?

[Assistant State's Attorney]: Just that I believe the case law is clear that the time we are looking at is from the time the minors were removed to the present date, and that is the relevant evidence in this case.

THE COURT: The objection is sustained. We are limited to the dates between the date that the minors were adjudicated and 12 months following that date.

\* \* \*

[Assistant State's Attorney]: Your Honor, if I may have some clarification. Are we proceeding then from the date the original petition was filed? Is that what the court meant? I'm not sure what the time restriction is that is being placed on us.

THE COURT: I indicated that what we are looking at is the time period from the date of adjudication, which the court record indicates was August 30, 1985, starting on that date and then to the next 12 months. If there is other evidence that you or somebody wants to present that is more than 12 months beyond that date, then we can consider that also."

■ Section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m)) provides a court may find a parent unfit for failure "to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent *within 12 months after an adjudication*" of neglect or dependency. (Emphasis added.) Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).

As written, this statutory language is capable of two contradictory interpretations. The first interpretation is a determination of unfitness must be based solely on parenting efforts or progress during the period beginning with adjudication and ending 12 months thereafter. The second interpretation is a determination of unfitness must be based upon parenting efforts or progress made during the entire period between adjudication and filing of the termination petition. Under this latter interpretation, the length of the period is not limited by the statute.

In *In re R.S.* (1988), 174 Ill. App. 3d 132, 528 N.E.2d 25, the Third District Appellate Court adopted the latter interpretation of the statute, and we agree with this finding. It is clearly in the best interest of the child to consider respondent's conduct during the entire post-adjudication period. Such a determination is a more true representation of respondent's efforts and progress. Accordingly, the stat-

ute also serves to protect respondent. As written, the 12-month period is a limiting provision, which guarantees respondent a minimum of 12 months in which to improve the situation between adjudication and a hearing on the issue of termination. In reviewing respondent's situation, the court should consider both favorable and unfavorable evidence regarding fitness to parent. An interpretation of the statute permitting evidence of respondent's efforts or progress made during the entire period between adjudication and a hearing on the termination petition more clearly meets these policy concerns and more clearly comports with our responsibility to protect minors from neglect and abuse.

■ With regard to the court's statements, we do not find it was the court's intent to limit the admission of evidence to events occurring only during the 12-month period after adjudication. Though somewhat inartfully stated, the court was explaining it did not wish to hear evidence regarding incidents which occurred prior to the initial filing of the petitions. From the record, we understand this was also the objective of respondent's attorney's objection. The court's written order, stating respondent had failed to make progress within 12 months after adjudication, was merely a recitation of the statute and, in light of all the other factors, does not indicate an intent by the court to limit evidence of conduct only occurring during the 12-month period. Instead, the trial court appropriately considered evidence of respondent's conduct during the entire post-adjudication period. Both respondent and the State presented evidence of respondent's conduct beyond 12 months after adjudication. This evidence was both favorable and unfavorable to respondent.

Respondent alleges the trial court further erred in admitting evidence of an indicated report against her concerning abuse of another child. Respondent contends such information is irrelevant to the proceedings and made this objection at the termination hearing. The evidence received at the termination hearing regarding this allegation came on redirect examination of Barbara Bernett. The State asked Bernett if DCFS had an indicated abuse report against respondent regarding children other than her own. Bernett indicated DCFS had received a hotline report on April 29, 1986, to the effect respondent had sexually abused the 2½-year-old niece of Russell Daniels and Daniels' three-year-old son, S.D. The report alleged respondent had fondled the genitals of the niece and taken pictures of the two children engaging in sexual acts. Respondent was also alleged to have masturbated in front of the children. The incident occurred at a time when respondent had been entrusted with the care of both children. Following

an investigation by the Quincy police department and DCFS, the report was given indicated status. Respondent pursued an administrative hearing before DCFS, and the review board expunged the allegations respondent had fondled the niece's genitals and photographed the children engaging in sexual acts. The portion of the report alleging respondent sexually exploited the children by masturbating in their presence still has indicated status.

■ Evidence is relevant if it has any tendency and reason to prove any material fact in issue. (*People v. Free* (1983), 94 Ill. 2d 378, 447 N.E.2d 218.) The court heard evidence from Bernett and Dr. Karp that part of the reason for removing the children was respondent had allowed others to abuse the children and had not otherwise provided proper and necessary care for their well-being. Karp attributed A.T.'s sexual precociousness and aggressiveness to incidents of sexual or physical abuse perpetrated upon her or from witnessing such acts between respondent and others in the household. He also ascribed A.T.'s developmental language disorder and regressive behavior to a pervasive trauma such as physical abuse, neglect, and lack of nurture occurring early in her life.

■■ Evidence respondent was engaging in sexual conduct in the presence of other children entrusted in her care eight months after the adjudication of neglect of her own children bears directly upon the efforts and progress respondent was making to rehabilitate herself. As such, this evidence is not irrelevant. This evidence also does not constitute inadmissible hearsay as sections 2—18(3) and 2—18(4)(b) of the Act (Ill. Rev. Stat. 1987, ch. 37, pars. 802—18(3), (4)(b)) directly provide for its admission. Accordingly, the trial court did not err in admitting such evidence.

Judge Paul A. Kolodziej presided over this case from its inception through January 17, 1986. Accordingly, he presided over the hearing for temporary shelter care, the hearing of adjudication and disposition. Judge John Wooleyhan was then appointed to the case and presided through its conclusion on June 8, 1989. At the close of the evidence at the termination hearing, respondent's attorney argued the State had not sustained its burden of proof because it had failed to provide the court with a record of the prior proceeding which resulted in the finding of neglect. Respondent's attorney argued that as a different judge was now presiding over this matter, it would be impossible for the court to measure respondent's efforts or progress without knowing the prior status of the case. In response, the court advised all parties that in making a decision it would be reviewing the notes it had made during the termination hearing and the entire rec-

ord of the case with specific emphasis upon the reports from DCFS.

The record does not indicate why a transcript was not provided; however, we do not find this to constitute reversible error. The court was provided with all court records, including the petitions, findings, reports, and orders. Bernett and Dr. Karp testified to the circumstances regarding the finding of neglect and how these circumstances related to respondent's efforts and progress. Judge Wooleyhan presided over this case for three years. Though he was not the judge at the time of adjudication, the case was assigned to him only six to seven months later.

This case is easily distinguished from *In re Enis* (1986), 145 Ill. App. 3d 753, 495 N.E.2d 1319, in which the Second District Appellate Court held the State failed to show by clear and convincing evidence respondent had failed to make reasonable efforts to correct conditions leading to removal. A different judge had presided over the termination hearing, and the court did not have before it any transcripts of the earlier hearings or any other presentation of facts supporting the abuse findings. The court found the absence of evidence which led to removal of the child prevented an accurate assessment of the parents' efforts. Unlike *Enis*, this court had sufficient evidence before it regarding respondent's status at the time of removal to appropriately review her efforts and progress. Additionally, respondent's attorney objected at the termination hearing to the State's elicitation of evidence regarding conditions which impelled the filing of the neglect petition. Having taken this position in the trial court, respondent cannot now complain of the alleged lack of evidence regarding her prior status.

On the other hand, respondent alleges the trial court erred in admitting evidence of the prior reports made by DCFS. These reports monitored respondent's progress pursuant to the service plan and had been periodically filed with the court. At the termination hearing, respondent did not object to the court's statement it was taking judicial notice of these reports.

It is incumbent upon the party opposing the taking of judicial notice to make such an objection. (*In re Johnson* (1985), 134 Ill. App. 3d 365, 480 N.E.2d 520.) Even aside from respondent's waiver of the issue, a court may take judicial notice of matters of record in its own proceedings. *People v. Davis* (1976), 65 Ill. 2d 157, 357 N.E.2d 792; *In re J.R.Y.* (1987), 157 Ill. App. 3d 396, 510 N.E.2d 541.

Respondent was given an opportunity on this occasion and on numerous other occasions to controvert the contents of these reports. A large portion of the content of these reports was testified to

by Bernett. We do not find respondent to be prejudiced or the court to have erred in reviewing such documents.

Affirmed.

McCULLOUGH, J., concurs.

JUSTICE STEIGMANN, specially concurring:

While I agree with the majority's analysis in this case, I write separately to express my dismay at the delay in the filing of the petition to terminate parental rights. On August 30, 1985, the dispositional hearing was held at which the court placed these children in a foster home pursuant to a finding that respondent was unable and unfit to care for them. On February 21, 1989, 3½ years later, a petition for termination of parental rights was finally filed and ultimately granted.

The evidence as reviewed by the majority demonstrates that the responsible authorities waited much too long for respondent "to get her act together" before this petition was filed. These children deserved better. Every child should have a stable, loving, secure, and *permanent* home. DCFS and the respective State's Attorney's offices ought to decide towards the end of the 12-month period provided by statute whether a petition to terminate parental rights should then be filed. (Ill. Rev. Stat. 1987, ch. 40, par. 1501(D)(m).) If a determination is made at that point not to file a petition to terminate parental rights, the issue should still be continuously reviewed as long as the children involved have not been placed back with a parent.

If neither DCFS nor the appropriate State's Attorney's office acts promptly to seek to terminate parental rights when that action is called for, then, as a last resort, the trial court must alert these agencies to the need to do so. Once the trial court makes its views known, I seriously doubt that it would ever need to take the extraordinary (and probably unwise) step of *directing* the State's Attorney to file a petition to terminate parental rights, assuming that the court even had the authority to do so under section 2—13(1) of the Juvenile Court Act of 1987 (Act) (Ill. Rev. Stat. 1987, ch. 37, par. 802—13(1)). Of course, when a judge has indicated there is a need for a petition to terminate parental rights to be filed, that judge must thereafter recuse himself or herself from any proceedings on that petition once it is filed.

Trial courts must bear in mind that the formal order entered at the dispositional hearing (when the court finds the best interest of an

abused or neglected child so requires) is to adjudicate the child a *ward of the court.* (See Ill. Rev. Stat. 1987, ch. 37, par. 802—22(1).) The statute does *not* say a "ward of DCFS" or a "ward of the State's Attorney." Section 2—28 of the Act (Ill. Rev. Stat. 1987, ch. 37, par. 802—28) provides the mechanism for periodic review by the *court* of the status of *its wards.* Part of the court's review always should be an inquiry as to whether its wards have permanent homes, and, if not, why not.

Delays of 3½ years in the filing of a petition to terminate parental rights are explainable only if the basis for that petition was a late-occurring event. That is clearly not the situation in the present case.