*In re* M.S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. B.S., Respondent-Appellant).

Second District   No. 2—90—0556

Opinion filed April 4, 1991.

Richard H. Schmack, of Sycamore, for appellant.

Michael P. Coghlan, State's Attorney, of Sycamore (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GEIGER delivered the opinion of the court:

The respondent, B.S., appeals from the trial court's order of March 28, 1990, terminating her parental rights to her son, M.S. The respondent raises the following issues: (1) whether the State proved, by clear and convincing evidence, that she is an unfit parent; and (2) whether the trial court erred in admitting the respondent's medical records into evidence. We affirm.

On October 12, 1989, the State filed a petition for termination of parental rights which was subsequently amended to include additional statutory grounds which had been omitted from the original petition. At the hearing on the amended petition, the following testimony was elicited. M.S., the respondent's son, was born on November 25, 1983. On January 27, 1984, the State filed a petition claiming that M.S. was abused and neglected due to an environment that was injurious to his welfare in that his father, the respondent's husband, "did handle the child in such a manner as to injure the child and cause bruises." On October 31, 1984, an adjudicatory order was entered, finding M.S. to be abused and neglected for the reasons set forth in the petition. The court placed M.S. in the custody of the Department of Children and Family Services (DCFS). On December 11, 1985, the trial court or-

dered that the guardianship of M.S. remain in DCFS but that he be returned to his parents' home.

M.S. resided with both of his parents until approximately June 1987 when his parents separated. He continued to reside with his father until November 4, 1987, when DCFS again placed him in a foster home. The basis for that placement was violence between M.S.'s father and the woman with whom he was living. It was stipulated that M.S.'s father had agreed to the voluntary termination of his parental rights to M.S.

On October 12, 1989, the State petitioned to terminate respondent's parental rights. The petition alleged that the respondent had failed to maintain a reasonable degree of interest, concern, or responsibility as to M.S.'s welfare, that she had substantially neglected M.S., that she failed to protect M.S. from conditions within his environment, and that she had failed to make reasonable efforts to correct the conditions which were the basis of M.S.'s removal. (See Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(b), (D)(d), (D)(g), (D)(l).) On February 28, 1990, the State amended its petition to allege additional statutory grounds for unfitness.

On March 28, 1990, the case proceeded to hearing. Veronica Cavell, the DCFS caseworker assigned to the case from 1984 to 1989, testified that through family counselling in 1984, it was determined that the respondent and M.S.'s father had problems with alcohol. She further testified that the respondent was to attend counselling sessions and that, although she had participated initially, she never had completed either family or alcohol-abuse counselling.

Cavell also testified that sometime around October 12, 1987, she received a letter from Alcare, a facility that evaluates and treats chemical abuse, stating that the respondent had an alcohol- and cannabis-dependency problem requiring inpatient treatment. The letter, which was admitted over objection, suggested that the respondent enter an inpatient chemical dependency program.

Cavell further testified that she prepared a client service plan for the respondent for the time period from July 30, 1986, to February 1987. A service plan is a case plan whereby DCFS and the parent are assigned tasks to meet a named objective. The plan included addressing the respondent's substance-abuse problem by requiring her to enter into inpatient treatment and to participate in counselling to improve the stability of her family life. She was also to refrain from consuming alcohol. Cavell stated that the goal of the service plan was to allow M.S. to resume living with the respondent. The respondent did not achieve the goals set forth in that service plan.

From March 10, 1987, to July 1987, a second service plan was in effect. Cavell testified that she "had information" that the respondent consumed alcohol while the service plans were in effect. The respondent also failed to achieve the goals of subsequent service plans, which were in effect until January 1989.

In January 1989, the original "goal" of returning M.S. to the respondent's home was changed to the placement of him in substitute care pending the court's decision. The change in goal resulted in the reduction of the number of times that the respondent was allowed to visit M.S. to one visit a month. The respondent was present when the goal was changed. Cavell testified that the respondent "continually and regularly" visited M.S. from 1987 until the summer and fall months of 1989 "when she moved and didn't let us know where she was." After Cavell "found [the respondent after her move] and tracked her down," B.S. again began to visit M.S. At the end of October 1989, Cavell ceased being the respondent's caseworker. She did not tell the respondent that she was no longer her caseworker, but she testified that if the respondent had telephoned the DCFS office, they would have told her who her new caseworker was.

Susan Todd, M.S.'s foster mother from July 1989 to February 1990, also testified for the State. She stated that M.S. had his sixth birthday on November 25, 1989, and B.S. visited him that day. M.S. was excited before the visit, but was "quiet" after the visit. Todd testified that when she asked M.S. how things went and if he got the cake and presents he was promised, he was sullen and replied that all he got was a can of pop for his birthday.

Adrian Riipi, the respondent's caseworker from November 1989 until the time of trial, testified that she never had told the respondent that she could not visit M.S. She had, however, only seen the respondent twice in five months. To her knowledge, the respondent had not seen M.S. since November 1989.

Over the respondent's objection of confidentiality, the trial court admitted the respondent's records from Alcare and her records from the Ben Gordon Community Health Center (Gordon).

The respondent testified that on November 4, 1987, she placed M.S. in foster care since she "couldn't take him because [she] didn't have a place to live" and that M.S.'s father wanted M.S. in a foster home. She stated that when she visited M.S. on his birthday in 1989, she could not afford to buy him a birthday gift because she was "flat broke" and only had "enough money to get food for the week." She said that M.S. was not upset or distraught but was laughing and hav-

ing fun and understood that she could not afford to buy him a birthday present.

The respondent testified that in 1984 DCFS required that she and M.S.'s father go to group therapy, alcohol treatment, and parent training counselling. Alcare assessed her as having a problem with alcohol or cannabis in 1987. The Alcare counsellor suggested that she either go into inpatient care for 28 days or go into outpatient care. She chose the outpatient care since she was still living with M.S.'s father at the time, and he was unemployed "and drinking." She had to be at home because "somebody had to be there for [M.S.]." No one at either Alcare or DCFS did anything to aid her in outpatient therapy, but "kept pushing inpatient."

The respondent testified that, as of the date of trial, she was not using illegal substances. She admitted that she smoked marijuana in 1980. She testified that she used to drink every four or five days, consuming about two drinks each time. However, the last time that she had two drinks was two years ago, and there are days when she does not drink at all. She disagreed with the Alcare assessment that she has a drinking problem.

The respondent testified that she did not go to the parent training classes because she did not receive a letter telling her the date or location of the classes. She had, however, in 1986, gone to four group parent training meetings since the court report advised her where and when to go. Since 1986, she had been told to go to parent training, but not where and when the classes were conducted.

The respondent stated that she did start counselling at Gordon and attended individual and group sessions. She ceased going to the counselling sessions because "[t]hey weren't helping me."

The respondent testified that Veronica Cavell never told her that she was not continuing as her caseworker. She was not informed of the change until January 1990. Further, she never received a copy of her last service plan and was never informed that the goal had changed from returning M.S. to her custody to placing him in a foster home. She did not try to visit M.S. during Christmas 1989 because she was again moving. Although she did not get M.S. a Christmas gift, she did send him a card which was delivered by her boyfriend. She did not recall whether she contacted anyone at DCFS after she moved.

Two years before the hearing, DCFS required the respondent to submit for psychological testing. The respondent testified that Cavell told her that she would "set up" the testing, but never told her the date or place of the test.

After the respondent's testimony and summations by both parties, the trial court ordered that the respondent's parental rights be terminated. This appeal followed.

Before reaching the issues that the respondent raises on appeal, we note that the State has asked that we reconsider our denial of its motion to dismiss this appeal for lack of jurisdiction. The State argues that respondent's notice of appeal was filed after the 30-day period for filing an appeal.

On March 28, 1990, the trial court orally ruled that it was terminating the respondent's parental rights. It entered its written order to that effect on March 30, 1990, and the respondent's notice of appeal was not filed until May 24, 1990. However, on April 17, 1990, the respondent moved for the appointment of appellate counsel since she sought to appeal the trial court's decision. On April 24, 1990, the trial court granted the respondent's motion and further ordered that the clerk of the court prepare and file a notice of appeal on the respondent's behalf.

Supreme Court Rule 606(a) states that if a criminal defendant requests "in open court at the time he is advised of his right to appeal or subsequently in writing, the clerk of the trial court shall prepare, sign, and file forthwith a notice of appeal." (134 Ill. 2d R. 606(a).) Although the termination of parental rights is a civil matter (see *In re Marriage of Engelbach* (1989), 181 Ill. App. 3d 563, 571), article VI of the supreme court rules (134 Ill. 2d Rules 601 through 663) pertains to appeals in criminal cases, post-conviction cases, and juvenile court proceedings. With reference to Rule 606(a), then, we find that given the court's order to the clerk to file a notice of appeal on behalf of the respondent, the respondent should not be charged with responsibility for the delay in filing the notice in this proceeding which is governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.*). (See also *People v. Sanders* (1968), 40 Ill. 2d 458.) This appeal will, therefore, not be dismissed for late filing.

We now turn to the merits of the appeal. The respondent first argues that the petition and the amended petition insufficiently allege that she is an unfit parent. In its petition and amended petition against the respondent, the State alleged that the respondent was an unfit parent under section 1(D)'s subsections (b), (d), (g), and (*l*) (Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(b), (D)(d), (D)(g), (D)(*l*)).

The essential test of the sufficiency of the petition is whether it reasonably informs the respondent of a valid claim against her. (See *In re Harpman* (1986), 146 Ill. App. 3d 504, 512.) The requirement of

pleading with specificity does not mandate that there be more than a setting forth of the specific statutory grounds of unfitness. *In re G.W.S.* (1990), 196 Ill. App. 3d 107, 109.

■ In its original petition, the State tracked the language of section 1(D)'s subsections (b), (d), (g), and (*l*) (Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(b), (D)(d), (D)(g), (D)(*l*)). The amended petition alleged additional instances of unfitness and incorporated the original petition. We find that since the amended petition set forth the specific statutory grounds of unfitness, it was sufficient to apprise the respondent of the claim against her. See *G.W.S.*, 196 Ill. App. 3d at 109.

The respondent then argues that the State did not prove, by clear and convincing evidence, that she was an unfit parent (see Ill. Rev. Stat. 1989, ch. 40, par. 1501) and, therefore, that she should not have had her parental rights terminated.

■ Section 1(D) of the Adoption Act (Ill. Rev. Stat. 1989, ch. 40, par. 1501(D)) defines an "unfit person" as "any person whom the court shall find unfit to have a child, without regard to the likelihood that the child will be placed for adoption." Section 1(D) then states the grounds of "unfitness." Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(a) through (q).

■ A finding of parental unfitness must be supported by clear and convincing evidence. (See *In re Paul* (1984), 101 Ill. 2d 345, 352.) Also, the trial court's findings of unfitness must be given great deference since the court has the opportunity to view and evaluate the testimony of the witnesses, and the trial court's decision should not be reversed on appeal unless it is contrary to the manifest weight of the evidence. *In re Allen* (1988), 172 Ill. App. 3d 950, 956.

■ The State contends that it proved the respondent to be unfit under section 1(D)'s subsections (b) and (m), which define as grounds of unfitness:

"(b) failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare;

\* \* \*

(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after the adjudication of neglected minor, abused minor or dependent minor." Ill. Rev. Stat. 1989, ch. 40, pars. 1501(D)(b), (D)(m).

■ "Reasonable progress" requires, at a minimum, measurable or demonstrable movement toward the goal of return of the child, but whatever amount of progress exists must be determined with proper

regard for the best interests of the child. (*In re R.M.B.* (1986), 146 Ill. App. 3d 523, 528.) Such an inquiry might well involve consideration of the limitations of the parents. *In re Edmonds* (1980), 85 Ill. App. 3d 229, 233.

Before we consider the respondent's argument on the sufficiency of the evidence, we first consider her assertions of evidentiary error. The respondent first argues that only the first 12-month period after M.S.'s adjudication as an abused and neglected minor was relevant to her alleged failure "to make reasonable progress" under subsection 1(D)(m). On October 17, 1984, M.S. was adjudicated an abused and neglected minor. Thus, more than 12 months had elapsed since M.S. was adjudicated when the State brought its petition to terminate the respondent's parental rights. The State's evidence was not limited to the first 12 months following M.S.'s adjudication.

In *In re R.S.* (1988), 174 Ill. App. 3d 132, the State sought to prove the respondent parent's unsatisfactory progress under subsection (m). Its supplemental petition to terminate parental rights was filed more than two years following the child's adjudication as dependent. The respondent there argued essentially identically to the respondent here that only evidence from the first 12 months following the child's adjudication was relevant to her unfitness under subsection (m).

■ The *R.S.* court considered what period of the parent's conduct toward the child was relevant to the parent's unfitness under subsection (m). (174 Ill. App. 3d at 133-34.) It interpreted subsection (m) and found that "it is clearly in the best interest of the child to consider the parent's conduct during the entire post-adjudication period." (174 Ill. App. 3d at 133-34.) With reference to the reasoning in *R.S.*, we find that the testimony at issue here was properly admitted and considered in determining whether the respondent was unfit.

The respondent also argues that the trial court erred in admitting her Alcare report and medical records pursuant to the Juvenile Court Act.

■■ The respondent first contends that the trial court should have sustained her objection and refused the admission of her Alcare report on the grounds of confidentiality. However, under section 2—18(4)(e) of the Juvenile Court Act, "[t]he privileged character of communication between any professional person and patient or client, except privilege between attorney and client, shall not apply to proceedings subject to this Article." (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(4)(e).) Since section 5—31(2) of the Juvenile Court Act (Ill. Rev. Stat. 1989, ch. 37, par. 805—31(2)), which states that a parent

must be found unfit under the Adoption Act, is part of the "Article," this proceeding is under the Juvenile Court Act. We, therefore, find that the trial court did not err in admitting the respondent's Alcare report into evidence.

■■ The respondent also argues that the admission of her medical records under the business records exception to the hearsay rule (134 Ill. 2d R. 236) was improper. The respondent correctly points out that medical records are excluded from the business records exception to the hearsay rule. (See 134 Ill. 2d R. 236(b).) She further argues that section 2—18(4)(a) of the Juvenile Court Act, which provides an exception to the general limitation on the admission of medical records as business records, does not apply in this case. The State argues that the records were admissible under section 2—18(4)(a) of the Juvenile Court Act.

■■ Section 2—18(4)(a) of the Juvenile Court Act provides, in pertinent part:

> "(4)(a) Any writing, record *** made as a memorandum or record of any condition *** *relating to a minor in an abuse, neglect or dependency proceeding,* shall be admissible in evidence as proof of that condition *** if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it ***. A certification by the head or responsible employee of the hospital or agency that the writing, record *** is the full and complete record of the condition *** and that it satisfies the conditions of this paragraph shall be prima facie evidence of the facts contained in certification." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 37, par. 802—18(4)(a).

Having already determined that the rules of evidence, as modified by the Juvenile Court Act, apply in proceedings for the termination of parental rights, we must now determine whether the trial court properly admitted the respondent's medical records.

Respondent claims that, since the medical records introduced at the trial relate to her condition and not to that of the minor, they fail to satisfy the statutory prerequisite that they be made as a "memorandum or record of any condition, act, transaction, occurrence or event relating to a minor." (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(4)(a).) Respondent cites no case to support that interpretation.

■■ It is clear that the legislature intended that the provisions of the Juvenile Court Act be liberally construed. (See Ill. Rev. Stat. 1989, ch. 37, par. 801—2(4).) We find that the medical records of the respondent, which were created as a direct result of the ongoing juve-

nile proceeding and relate to a condition which is also directly related to the proceeding, satisfy the statutory requirement of "relating to a minor" and are, therefore, admissible under the Juvenile Court Act. (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(4)(a).) We therefore find that the trial court did not err in admitting the medical records.

■■■ Having considered the respondent's evidentiary arguments, we lastly return to her argument that the evidence here was insufficient. We observe that the respondent has admitted that she had not successfully completed any of the service plans drawn by the State when the established goal was for M.S.'s return to the respondent's home. Further, she testified that transportation to any outpatient treatment would not have been a problem, yet she did not attend any outpatient meetings. She also stopped attending other counselling sessions two months after M.S. was returned to the home even though every service plan required her attendance at those meetings. We cannot find that the finding by the trial court that the respondent failed to make "reasonable progress" was against the manifest weight of the evidence. See *In re Allen* (1988), 172 Ill. App. 3d 950, 956.

The decision of the circuit court of De Kalb County is affirmed.

Affirmed.

DUNN and UNVERZAGT, JJ., concur.