652 N.E.2d 421 (1995)
273 Ill. App.3d 193
209 Ill.Dec. 881
In the Interest of J.T.C., Alleged to be a Neglected Minor (the People of the State of Illinois, Petitioner-Appellee,
v.
Jennifer Travelstead-Cummings, Respondent-Appellant).
No. 4-94-1059.
Appellate Court of Illinois, Fourth District.
Argued June 15, 1995.
Decided June 29, 1995.
*422 Alan J. Novick (argued), Jennings, Novick, Taseff, Smalley & Davis, P.C., Bloomington, Jennifer Travelstead a/k/a Jennifer Cummings.
Charles G. Reynard, State's Atty., Bloomington, Norbert J. Goetten, Director, State's Attys. Appellate Prosecutor, Robert J. Biderman, Deputy Director, State's Attys. Appellate Prosecutor, Scott A. Manual (argued), Staff Atty., State's Atty. Appellate Prosecutor, Springfield, for People.
Justice LUND delivered the opinion of the court:
Respondent Jennifer Travelstead-Cummings appeals an order of the circuit court of McLean County finding her to be an unfit parent and terminating her parental rights to her son, J.T.C. We affirm the finding of unfitness, reverse the termination of parental rights, and remand for a new hearing on that issue.
Respondent gave birth to J.T.C. in March 1989, two days after her fifteenth birthday. In February 1991, petitions were filed in Logan County alleging that respondent was a dependent minor (Ill.Rev.Stat.1991, ch. 37, par. 802-4(1)(a)) and that J.T.C. was a neglected minor by reason of an injurious environment (Ill.Rev.Stat.1991, ch. 37, par. 802-3(1)(b)). By stipulation, respondent was adjudicated a dependent minor, J.T.C. was adjudicated a neglected minor, and they were placed together in foster care. At a review hearing in June 1991, it was stated to the court that since respondent was not home to care for J.T.C., he was placed in foster care elsewhere. At a review hearing in October 1991, it was represented to the court by the prosecutor that respondent had become involved in a drinking episode with a convicted felon who had abused her. She was ordered to exercise more discretion in her choice of friends, maintain employment, submit to a drug and alcohol evaluation, pursue a general equivalency diploma (GED), and participate in counseling. Limited contact with J.T.C. was also ordered.
The case was transferred to McLean County in August 1993. In August 1994, a petition to terminate respondent's parental rights was filed on the grounds that she had failed to make reasonable efforts to correct the conditions that were the basis for J.T.C.'s removal from her custody and that she had failed to make reasonable progress toward the return of J.T.C. to her within 12 months of his adjudication of neglect. 750 ILCS 50/1(D)(m) (West 1992).
At the hearing on the petition in November 1994, Justine Wheeler, caseworker at Youth Services of Mid-Illinois, testified that she has been J.T.C.'s primary counselor for the past year and has had only occasional contact with respondent. There had been some problems in J.T.C.'s foster home and in school, which led to a diagnosis of attention deficit disorder. He had just started taking medication for this condition that very day. It would take a very patient, skilled person to be able to care for a child of this nature. She had not yet spoken to respondent about J.T.C.'s problems. Respondent's service plan goals have been to obtain counseling, maintain stable employment and housing, and obtain a drug and alcohol evaluation. She supervised two visits between respondent and J.T.C. over the last three months *423 when the family specialist was unable to do it. Each visit lasted one hour. There was positive interaction between respondent and J.T.C. at both visits. Respondent disciplined J.T.C. appropriately both times and talked to him about the importance of school and good behavior. Wheeler and respondent discussed respondent's unstable housing situation during both visitations.
Susan Azukas, family specialist for respondent and J.T.C., testified that her function is to supervise visits and assist the parents in meeting their service plan goals. She has been working with respondent for approximately two years. She has seen her on a weekly basis for the visits and, also, on a one-on-one basis. She has rated respondent's compliance with all her service plan goals as unsatisfactory. She had made several appointments for respondent for her drug and alcohol evaluation, and respondent kept only one of those appointments. She did not complete the full assessment. Respondent has admitted using marijuana and alcohol. Azukas has attempted since March 1993 to assist respondent in locating employment but, to her knowledge, respondent has had only two jobs since March 1993. Neither job lasted more than a few days. She had a job at a fast food restaurant at one time that lasted three weeks. She did not assist respondent in determining what jobs she might be qualified for or help her establish any job skills. Respondent did initiate some employment on her own, but did not follow through by keeping the jobs. Since 1993, she has also attempted to assist respondent in obtaining stable housing through public aid and township assistance. Part of the problem with obtaining township assistance is that respondent was required to be employed. She did not work with respondent on her GED goal, but respondent is now enrolled in the classes. As to visitation, there was a two-month period during June and July 1993 when respondent missed all her visits with J.T.C. She did not want to be out in the community due to an outstanding arrest warrant. She never called to advise why she missed these visits or any other visits. For the past six months, she has been more regular in her visitation. She contacted J.T.C. by telephone on his birthdays and has brought him gifts. Despite progress made by respondent in her visits, Azukas still rates visitation as unsatisfactory because respondent still misses visits and does not call in advance. In addition, there is no planned activity for the visits. However, Azukas conceded there was not much that could be done in a one-hour visit.
Lara Hawks, caseworker for respondent and J.T.C. from October 1993 through February 1994, testified that she saw respondent about every other week. Her service plan goals were the same throughout the case. Respondent admitted to an alcohol addiction, but indicated she believed talking about her past would not help with her current problems. Respondent was rated unsatisfactorily in all her goals. Hawks offered to take respondent to seek employment and to obtain her drug and alcohol assessment, but respondent did not follow up. Respondent did not keep Hawks informed as to her living arrangements. She does know that respondent lived in at least three different places during the four months she was involved in the case.
Eric Hardison, respondent's counselor, testified that after respondent's evaluation it was recommended that she receive counseling. She was referred to him for an evaluation because of a concern that she might be suffering from depression. She was also angry and had impulsive behaviors. His findings were that she was not depressed, but her relationship with males was a matter of concern. She had a good level of intelligence and could have done well in school if her education not been interrupted. She attended 20 counseling sessions between the fall of 1991 and spring of 1992. He recommended she continue counseling, but she did so on only a sporadic basis. She failed to keep several appointments and did not call in advance to cancel.
Respondent, age 20, testified that she agreed the goals set in her client service plan were appropriate. When asked why she had not achieved those goals, respondent replied:
"Well, there's a lot ofI have another life besides just [J.T.C.]. They came in my home, and they took him and they separated us so thatthat gave meI mean he *424 has started a new life, and I had a responsibilities [sic] outside of just what [J.T.C.] needs me to do to take care of. And there was things that I was going through and things thatpositions I was inI mean there just wasn't"
Respondent testified that she has not attended any of her GED classes recently, but she is enrolled. Although she has been busy trying to obtain housing through township assistance, she has not succeeded thus far and does not know when she will have it. She is not currently employed and has not worked since August or September 1994. She is registered with Job Service and Kelly Temporary Services, and she made two job applications within the last week. She was married in September, and she and her husband are living with friends. Although her husband would be receptive to having J.T.C. live with them, she believes it would be difficult because they are both so young and it might take him some time to adjust to having J.T.C. in the home. She denied ever admitting to an alcohol problem. Since August 30, 1994, she has lived three different places. When asked how many places she had lived over the past 12 months, she replied, "I couldn't even count." She admitted it was in her best interests to continue counseling, but she did not continue.
At the conclusion of the hearing, the court found respondent to be an unfit parent by reason of her failure to make reasonable progress toward J.T.C.'s return within 12 months of his adjudication as a neglected minor. The court made no findings as to whether termination of respondent's parental rights would be in J.T.C.'s best interests. In its written order terminating respondent's parental rights, the court simply found that it was in J.T.C.'s best interests that his guardian be granted authority to consent to his adoption.
On appeal, respondent first argues that the court's finding of unfitness was against the manifest weight of the evidence. Courts will not lightly terminate parental rights, recognizing the importance of those rights. (In re A.T. (1990), 197 Ill.App.3d 821, 825, 144 Ill.Dec. 283, 286, 555 N.E.2d 402, 405.) Parental rights of a nonconsenting parent may be terminated only upon a finding of unfitness (In re S.G. (1991), 216 Ill. App.3d 668, 669, 159 Ill.Dec. 125, 126, 575 N.E.2d 932, 933), and such a finding must be supported by clear and convincing evidence (In re Allen (1988), 172 Ill.App.3d 950, 956, 123 Ill.Dec. 184, 188, 527 N.E.2d 647, 651). The trial court's finding will not be reversed unless it is against the manifest weight of the evidence, since that court had the opportunity to see the witnesses and evaluate their credibility. (Allen, 172 Ill.App.3d at 956, 123 Ill.Dec. at 188, 527 N.E.2d at 651.) The court's finding should therefore be given great deference. In re C.R. (1991), 221 Ill. App.3d 373, 379, 163 Ill.Dec. 779, 783, 581 N.E.2d 1202, 1206.
We need not address respondent's argument that the trial court erred in finding she had not made reasonable efforts to correct the conditions that were the basis for J.T.C.'s removal from her custody. The court made no findings as to this ground of unfitness, but rather rested its determination solely on the basis that respondent had failed to make reasonable progress toward J.T.C.'s return to her within the required 12-month period. The court noted that respondent herself admitted she had failed to achieve her goals, and her justification for this was that she had other problems and another life that does not involve J.T.C. and his needs. The court noted the inconsistency with which respondent seemed to approach the need to meet her goals and found this showed there had been no reasonable progress, not only over the prior 12 months, but from the time of J.T.C.'s adjudication and the time the petition for termination was filed. It is well settled that a finding of parental unfitness may be based upon evidence sufficient to support any one statutory ground. In re Edmonds (1980), 85 Ill.App.3d 229, 232-33, 40 Ill.Dec. 530, 533-34, 406 N.E.2d 231, 234-35.
An assessment as to whether a parent has made reasonable progress toward return of a child involves an objective judgment based upon the amount of progress made by the parent. At a minimum, some measurable or demonstrable progress toward *425 the goal of reunification must be shown. Reasonable progress may be found when the court, based upon the evidence, can conclude a parent's progress is sufficiently demonstrable and is of such a quality that the child can be returned to the parent in the near future. (In re L.L.S. (1991), 218 Ill.App.3d 444, 461, 160 Ill.Dec. 804, 816, 577 N.E.2d 1375, 1387.) In making this determination, the court should consider progress made during the entire post-adjudication period, not simply during the 12 months immediately following the adjudication. A.T., 197 Ill.App.3d at 832, 144 Ill.Dec. at 288, 555 N.E.2d at 409.
Respondent argues that it was necessary for the trial court to have evidence of her status at the time of J.T.C.'s removal from her custody to determine whether she had made reasonable progress. She notes that the adjudication was accomplished by stipulation and there was no factual basis stated. However, in L.L.S., this court specifically rejected such an argument, noting that when a court removes a child from a parent's custody, the reasons for the removal should be factors in determining goals set for the parent to regain custody. Once this has been done, the focus should be on the parent's progress in meeting those goals. (L.L.S., 218 Ill.App.3d at 463, 160 Ill.Dec. at 817, 577 N.E.2d at 1388.) In the present case, respondent testified that she agreed the goals set for her were appropriate, and she even stated that it was "obvious" what she had to do to regain custody of J.T.C. Thus, it was not necessary for the trial court to have evidence of respondent's status at the time of J.T.C.'s adjudication.
Respondent argues that the court should have considered her limitations in making a determination regarding her lack of reasonable progress, noting she was very young and was, herself, adjudicated a dependent minor at one time. She cites In re M.S. (1991), 210 Ill.App.3d 1085, 1093-94, 155 Ill. Dec. 671, 676, 569 N.E.2d 1282, 1287, in support of this argument, where the court stated that the inquiry into whether reasonable progress had been made might well involve consideration of the limitations of the parents. Whatever validity this argument may have in the appropriate case, it has none here. Although respondent was indeed very young when she gave birth to J.T.C. and only 16 years of age when he was adjudicated a neglected minor, there was no evidence as to how this factor may have affected her ability to meet her service plan goals. She admitted she knew what was required of her and that she did not meet those requirements. She did not attempt to excuse her lack of compliance by citing her lack of maturity. Her counselor found her to have a "good" level of intelligence and, had it not been for the interruption of her schooling by family problems and her pregnancy, she likely would have attained above-average grades in almost every subject. If lack of maturity was a proper factor to consider in these cases, foster homes in the State of Illinois would be jammed to the rafters with children waiting for their parents to mature to a level sufficient to regain custody. The record in this case clearly supports the trial court's finding of unfitness.
Respondent next argues that the trial court erred in terminating her parental rights because there was no evidence as to whether such termination was in J.T.C.'s best interests. Once a court finds a parent to be unfit, it must then determine whether termination of parental rights is in the best interests of the child. (Lael v. Warga (1987), 155 Ill.App.3d 1005, 1012, 108 Ill.Dec. 518, 523, 508 N.E.2d 1095, 1100; In re D.L.W. (1992), 226 Ill.App.3d 805, 809, 168 Ill.Dec. 570, 573, 589 N.E.2d 970, 973.) All other considerations must yield to the child's interests. In re I.D. (1990), 205 Ill.App.3d 543, 552, 151 Ill.Dec. 94, 100, 563 N.E.2d 1200, 1206.
Respondent notes that Justine Wheeler testified J.T.C. had attention deficit disorder and that it would take a very skilled and patient person to deal with such a child. She argues that assuming this was true, clear and convincing evidence that J.T.C. was being cared for by people possessing those qualities was crucial to a finding that termination of respondent's parental rights was in the best interests of J.T.C. Respondent cites no authority for this proposition and, in any case, we reject it. However, we are compelled to *426 remand this case to the trial court for a hearing on the issue of termination of respondent's parental rights. There was no evidence adduced as to J.T.C.'s status, other than that he had been diagnosed as having attention deficit disorder. The court heard no evidence at the hearing, nor did it have any report or other evidence in the record by which to judge whether termination of respondent's parental rights was in the best interests of J.T.C. The State argues that because the evidence showed respondent made no progress in achieving compliance with her client service plan, there was no reason to believe that J.T.C. could be returned to her any time soon. Therefore, the only alternative to termination of parental rights was indefinite foster care. However, the State overlooks the fact that in making a finding of unfitness under the "reasonable progress" standard, the court has implicitly found the child could not be returned to the parent in the near future. (See L.L.S., 218 Ill.App.3d at 461, 160 Ill.Dec. at 815-16, 577 N.E.2d at 1386-87.) Despite this fact, the court must still hear evidence on and consider the best interests of the child in determining whether to terminate parental rights.
Even after finding a parent unfit, trial courts should not treat the question of the best interests of a child (or children) lightly. A hearing with regard to their best interests will possibly allow evidence not admissible in a fitness hearing, thereby more fully informing the court of circumstances important to determine the best interests of the child. Evaluations not relevant in fitness hearings may be available. A fitness hearing focuses on the parent. The best interests of the child should not become an afterthought. Attempts to combine the two issues into one hearing presents this danger. A separate hearing and determination on the best interests issue is not a significant burdenbut its importance is very significant. The entire future of a child (or children) is involved. An erroneous termination of parental rightsor the failure to terminate when it should be donecan have serious adverse effects on the child and on future foster or adoptive parents.
Accordingly, that portion of the trial court's order finding respondent to be an unfit parent is affirmed, the termination of her parental rights is reversed, and the cause remanded for further proceedings.
Affirmed in part; reversed in part and remanded.
STEIGMANN and McCULLOUGH, JJ., concur.