699 N.E.2d 167 (1998)
298 Ill. App.3d 617
232 Ill.Dec. 720
In the Interest of J.G., a Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
Natasha Gray, Respondent-Appellant).
No. 4-97-0980.
Appellate Court of Illinois, Fourth District.
August 11, 1998.
*169 Dennis G. Woodworth (Court-appointed), Lewis, Blickhan, Longlett & Timmerwilke, Quincy, for Natasha Gray.
Barney S. Bier, State's Attorney, Quincy, Norbert J. Goetten, Director, Robert J. Biderman, Deputy Director, Jeffrey K. Davison, Staff Atty., State's Attorneys Appellate Prosecutor, for the People.
Presiding Justice GARMAN delivered the opinion of the court:
Following hearings in the circuit court of Adams County, orders were entered finding respondent Natasha Gray to be an unfit parent and terminating her parental rights. She now appeals, arguing that (1) the trial court erred in finding her unfit and terminating her parental rights and (2) the trial court erred in taking judicial notice of the case file, which contained reports of Illinois Department of Children and Family Services (DCFS), without making the requisite findings under section 2-18(4)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-18(4)(a) (West 1996)). We affirm.
J.G. was born in November 1993. He was removed from respondent's home in February 1995 after reports from witnesses who observed respondent handle J.G. very roughly, pulling his arm, biting him on the back of the head, and carrying him by one arm across a room. In addition, J.G. was found to have bruises on his buttocks. He was placed in shelter care and adjudicated a neglected minor on April 12, 1995. The trial court returned J.G. to respondent's care. She was ordered to not allow any contact between J.G. and Darryl Morse, who was respondent's boyfriend and a convicted felon. Her various service plans required her to attend parenting classes, attend regular visitation with J.G., and use appropriate parenting skills, provide a clean and healthy living environment for J.G., obtain her high school diploma or general equivalency diploma (GED), and attend counseling.
In July 1995, J.G. was removed from respondent's home and placed in foster care due to a temporary inability to locate him and respondent.
On April 7, 1997, the State filed a petition to terminate respondent's parental rights on the grounds that she had failed to correct the conditions that were the basis for J.G.'s removal and that she had failed to make reasonable progress toward J.G.'s return to her within 12 months of his adjudication. Hearings were held on this petition in July 1997. At the commencement of the hearing, the prosecutor asked the trial court to take judicial notice of the court file in the case. Defense counsel objected to the court taking judicial notice of any DCFS reports in the file. The basis of his objection was that such reports contained hearsay that is not admissible in a termination hearing. The prosecutor pointed out that there had been court reviews of respondent's case every six months and that respondent was present for each of these hearings. She therefore had the opportunity to read the reports and object to them or correct them. The trial court overruled the objection on that basis, noting it would be a legal fiction to ignore the contents of the case file in which the court had been involved for over two years. However, the court later modified its ruling to state that it would not consider any evidence that appeared to be unreliable and that respondent did not have an opportunity to controvert previously.
Jim Prow, a counselor to whom respondent was referred by DCFS in 1995, testified that he met with her on one occasion in November 1995. Several previous appointments had been scheduled, which respondent failed to keep. They were to work on anger control and parenting skills regarding how to discipline J.G. He made another appointment for respondent, but he never saw her *170 again. No progress was made during the initial interview on either of these goals because that time is used to gather information about a patient and establish a rapport with her.
Tracy Prow, an outpatient therapist at Transitions of Western Illinois, testified that respondent was referred to her in 1996 by Chaddock Center for Family Development (Chaddock) to address issues of parenting, self-esteem, and anger control. They had several sessions, at which respondent expressed some resentment against DCFS and Chaddock. Respondent indicated that she had attended a parenting class and she thought that was enough. Prow did not ask for, or see, any certificate of completion of such a class. She did not see respondent between April 1996 and January 1997. Several appointments were made during that time, but respondent did not appear.
Robin Martin, a parent educator for Family Service Agency, testified that she runs a program called Family Life Education Program (FLEP). Respondent was referred to this program three different times. FLEP is a parenting class, consisting of 15 weeks of group counseling and 15 weeks of individual counseling. Anyone who misses more than two sessions is dropped from the program. The first time respondent was in the program was in November 1995. She attended one session and was dropped from the program that same month. The second referral came in March 1996. Respondent was dropped from the program in April 1996 for missing too many sessions. In July 1996, respondent was again referred to FLEP. Martin made efforts to contact respondent, sending several letters and leaving a note on her door that a driver would pick her up on the day of the class. Martin never heard from respondent. Martin attended one visitation session with respondent in which respondent put a jelly bean in her mouth and then passed it to J.G.'s mouth with her tongue.
Martin stated that respondent was advised of the importance of completing the parenting classes in order to have J.G. returned to her. Respondent told Martin that she had completed a parenting class at Parenting Pals, but Martin did not see any proof of that. Martin believes respondent needed parenting classes. She did not have a cooperative attitude, telling Martin that she would raise her child in the manner she wanted to raise him.
Mary Schutte, J.G.'s foster parent from July 1995 to December 1996, testified that during the time she had J.G., he would kick, bite, and throw things. The first year he lived with Schutte, he would kick, scream, throw toys, fight, and pull hair when he returned from visitation. At times, respondent would call Schutte a "bitch" and other offensive names when she called on the telephone to talk to J.G. She accused Schutte of trying to keep J.G. from her. Respondent sometimes bought clothes for J.G. that were either too large or too small. After visitations, J.G. would be very agitated and difficult to manage. He had difficulty sleeping on those nights. However, he looked forward to the visits.
Linda Richmiller, visitation specialist with Bridgeway Family Services, testified that she supervised some of respondent's visits with J.G. She and Shelly Lewis from Chaddock took turns supervising. During a visit on Halloween in 1995, Richmiller took J.G. to respondent's apartment so she could see him in his Halloween costume. Respondent referred to J.G. as "her sexy man." When she changed his diaper, she said, "[M]ommy is going to get you" and pulled on J.G.'s penis several times. Another time, when Richmiller and J.G. arrived for visitation, Darryl Morse was in respondent's bed. During the same visit, respondent struck J.G. hard on the hand because he would not leave his coat on. Richmiller informed respondent several times that she was scaring J.G. and needed to change her attitude. Respondent replied that she would do what she wanted.
No third parties were to be present during visitations unless Richmiller was given prior notice; however, many times, there would be other people in the apartment when she and J.G. arrived for visitations. On one occasion, there were six people sleeping in the apartment when they arrived.
*171 Respondent did not properly supervise J.G. during visits at Richmiller's office. He would run into other rooms and take things off desks. In order to get him out of there, respondent would tell him there were monsters in those rooms.
Richmiller also testified that on several occasions during visits at respondent's apartment she would spend a lot of time on the telephone. She accepted collect calls from her boyfriend and others who were in jail, and she also called other people. On several occasions, respondent did not supervise J.G.
On one visit, respondent insisted on going to the cemetery to visit the grave of "Uncle Curtis." While there she made reference to a "joint," "our gang," and getting "high."
On one occasion, respondent insisted on going to the Department of Public Aid (Public Aid) office during a visitation with J.G. He dirtied his pants while they were there. Richmiller handed a diaper to respondent and she, in turn, handed the diaper to J.G. and said, "[H]ere, you can change your own damn pants, you're the one that shit them."
When Richmiller asked respondent if she had been attending parenting classes, respondent said that she had gone to Parenting Pals and did not have to attend parenting classes because she was a good mother.
During visitation at respondent's apartment, J.G. would often hit the walls with a metal bat. Respondent would scream at him and threaten to put him in "time out," but she very seldom followed through on her threats. J.G. did not mind respondent at all.
On one occasion when Richmiller and J.G. arrived for visitation, respondent said she was being evicted and had to go to a hearing. She wanted J.G. to go with her because she had represented to the housing authority that he lived with her. Respondent reminded Richmiller that she could not say anything to contradict this because Richmiller did not have a release of information to talk to the people at the housing authority. At the eviction hearing, respondent introduced Richmiller as her friend. Richmiller then testified as follows:
"[Prosecutor:] Q. So when you went to this hearing, what was the hearing about?
[Richmiller:] A. Well, it was Mr. Harper and Jane Tanner and the hearing was an eviction hearing and they read the charges that she was being evicted for loud parties, police being called, minors being there, people climbing in and out of the apartment, climbing on the roof and climbing in and out of the windows, and she had people hiding there after a burglary that were charged with burglary, and she hadand beer bottles thrown out the windows.
Q. And did [respondent] respond to these charges?
A. Her response to everything, most of it, it was [J.G.'s] fault. She said that [J.G.] had thrown the beer bottles out the window. She said that the people were climbing in and out of the window because she had accidentally locked J.G. in the apartment and they were going to get him, and at that time Mr. Harper reminded her that it was many times that people were climbing in and out of the windows, and she also said that minors were there because they were taking care of [J.G.] for her.
Q. Did she indicate during this hearing that [J.G.] was living with her?
A. At the end of the hearing she said she hoped they wouldn't evict her because J.G. wouldn't have a place to live and he might be taken away from her."
Richmiller testified that respondent was very rough with J.G., dragging him by one arm when he would not go someplace she wanted and biting him back when he bit her. One time, respondent told Richmiller she had learned the location of J.G.'s foster home and suggested she could take him any time she wanted. Respondent was late for her visits most of the time and she missed approximately one-third of her visits. Sometimes, she would call to confirm her attendance and then fail to show up. J.G. would become very upset. Richmiller rated respondent's parenting ability as "[v]ery, very poor." She did not follow through on anything; most of her parenting consisted of threats. She called Richmiller names in front of J.G. and swore at J.G.
*172 Richmiller stated that respondent told J.G. she loved him after the visits; J.G. did not want to leave and would cry.
Shelly Lewis, case manager with Chaddock, testified that she discussed the service plans with respondent and told her what she had to do to regain custody of J.G. Respondent had a tendency to get upset easily and to "yell and cuss" and call the service providers names. Eventually the goal of respondent obtaining her GED was discontinued in order to focus more on parenting and counseling. When Lewis reviewed with respondent her poor ratings on the service plans and lack of progress, respondent would become angry. As of February 1997, respondent was rated as unsatisfactory on all of her service plan objectives. Another concern was stability of respondent's home environment. During the time her service plans were in effect, respondent moved more than five times.
Respondent missed at least half the scheduled visits that Lewis was to supervise. Lewis' testimony regarding visitation was very similar to that given by Richmiller. Respondent failed to supervise or discipline J.G. and had an uncooperative attitude toward Lewis. Respondent was late for approximately 75% of the visits she attended. However, Lewis admitted that between July 1995 and early 1996, the majority of visits that respondent attended were good visits where J.G. and respondent interacted well and she used appropriate parenting skills. Respondent complained a few times about J.G.'s cleanliness when he arrived for visitation and she did not like the way he was dressed.
When respondent was told that a petition for termination of her parental rights would be filed, she became angry and threatened to remove J.G. from his foster home. Because of that threat, J.G. was moved to another foster home in December 1996.
Debra Cook, respondent's mother, testified that in the summer of 1996, J.G. arrived for visitation with stitches above one eye and on his head. Prior to that time, she noticed bruises on J.G.'s back and buttocks and he had a diaper rash that was scalded and infected. On many occasions, J.G. arrived at visitation dirty and in mismatched clothing. Cook was present at most of the visits; she disputed Richmiller's and Lewis' testimony that respondent often arrived very late for the visits.
Respondent testified that she took parenting classes through Parenting Pals prior to J.G. being removed from her home in July 1995. She did not complete the FLEP program because there were people in the class she knew and did not like. She did not want everyone knowing her business and talking about her. She wanted to meet with Martin individually only. She did not complete her counseling programs because she did all the talking and the counselors said nothing. Respondent denied the incident in the cemetery took place, stating she would never tell a caseworker she was getting "high." She also denied passing a jelly bean from her mouth to J.G.'s mouth. Respondent also stated that she would change J.G.'s clothing to check for marks he might have on his body. She said there were burn marks, bruises, scratches, and a bad rash.
She denied playing with J.G.'s penis. Her explanation was that she was simply cleaning his penis after a bowel movement because he was not circumcised all the way and there is a place that gets infected if not thoroughly cleaned. She also denied telling J.G. to change his own diaper at the Public Aid office. She raised concerns about J.G.'s cleanliness and appearance with the caseworkers, but she got no satisfaction. This affected her attitude toward DCFS. She denied being a gang member.
Respondent also denied that Morse was in her apartment on the day Richmiller and J.G. were there. She claimed a female friend who was staying with her was in the bedroom. She also denied ever dragging J.G. around by one arm or threatening J.G.'s foster family.
Following closing arguments, the trial court found respondent to be an unfit parent on both grounds alleged in the State's petition.
A separate hearing was held on the question of whether respondent's parental rights should be terminated. At that hearing, Lewis testified that, since December 1996, J.G. *173 has been in an adoptive placement. He appears very bonded to his foster parents and interacts well with the other foster child in the home. His behavior has improved greatly since he was placed there. The bond between respondent and J.G. was strong during the early visits, but it seemed to lessen over time.
Respondent testified that she recently gave birth to a daughter. J.G. has met the baby and seemed excited by having a sister. Respondent claimed she had changed and was working and going to school. She admitted that J.G. was still "hyper" around her. She currently lives in a one-bedroom apartment, but the bedroom is large and has a divider so that J.G. can have his own private sleeping area.
At the conclusion of the hearing, the trial court terminated respondent's parental rights.
On appeal, respondent argues that the State failed to prove by clear and convincing evidence that she is an unfit parent. The State's petition alleged two grounds of unfitness. It was alleged that respondent had failed to make reasonable efforts to correct the conditions that were the basis for J.G.'s removal from her custody and that she had failed to make reasonable progress toward the return of J.G. to her within 12 months of his adjudication. 750 ILCS 50/1(D)(m) (West 1994).
"Whether a parent's efforts to correct the conditions which were the basis for removing her children are reasonable involves a subjective judgment based upon the amount of effort which is reasonable for a particular person. [Citations.] In contrast, whether a parent's progress toward return of the children within 12 months of being adjudicated neglected is reasonable involves an objective judgment based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent. [Citations.] At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." (Emphasis in original.) In re Allen, 172 Ill.App.3d 950, 956, 123 Ill.Dec. 184, 527 N.E.2d 647, 651-52 (1988).
The evidence amply supported the trial court's finding that respondent failed to make reasonable efforts to correct the conditions that were the basis for J.G.'s removal from her custody. Those conditions were lack of supervision and risk of physical harm. Respondent had difficulty controlling her anger, which sometimes led to inappropriate discipline of J.G.
The State's evidence demonstrated that respondent failed to complete parenting classes despite three opportunities. She also failed to attend and complete counseling. She missed many of her visitations with J.G. and was late for most of the ones she attended, all of which upset J.G. She failed to demonstrate appropriate supervision of J.G. during visitations and, at times, failed to use appropriate methods of discipline. She spent parts of her visitation talking on the telephone and ignoring J.G., leaving Richmiller or Lewis to supervise him. Respondent admitted that she flatly refused to attend the FLEP classes, because of her concern about others knowing her business and spreading rumors about her. She gave up counseling after only a few sessions because it did not meet her expectations.
Respondent was told by the caseworkers that it was necessary to complete the objectives in her service plans to regain custody of J.G. Despite this, she persisted in her resistance to every attempt to assist her in doing so. Accordingly, the trial court properly found that respondent failed to make reasonable efforts to correct the conditions that were the basis for J.G.'s removal from her custody.
"Reasonable progress" is an objective standard that exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody. This is so because, at that point, the parent will have fully complied with the directives previously given her to regain custody of the child. In re L.L.S., 218 *174 Ill.App.3d 444, 461, 160 Ill.Dec. 804, 577 N.E.2d 1375, 1387 (1991).
The evidence in the instant case more than adequately supported the trial court's finding on this ground of unfitness. One year and nine months elapsed from July 6, 1995, when J.G. was first removed from respondent's custody following his adjudication to April 7, 1997, when the termination petition was filed. During that period, respondent made minimal, if any, progress on her service plan goals. She failed to complete parenting classes, she failed to complete counseling, and she failed to attend many of her visitations with J.G. She failed to supervise or properly discipline J.G. during visitations. She swore at the caseworkers in J.G.'s presence. She had an excuse for everything; she took no responsibility for her failures. All the testimony at the unfitness hearing, including that of respondent herself, demonstrated that she simply refused to undertake the tasks required to regain custody of J.G. Respondent's attitude prevented her from taking advantage of the services offered her. Thus, we conclude the trial court properly found that respondent failed to make reasonable progress toward J.G.'s return to her.
Respondent also argues that the trial court erred in terminating her parental rights. Courts will not lightly terminate parental rights, recognizing the importance of those rights. In re A.T., 197 Ill.App.3d 821, 825, 144 Ill.Dec. 283, 555 N.E.2d 402, 405 (1990). Parental rights of a nonconsenting parent may be terminated only after a finding of unfitness (In re S.G., 216 Ill.App.3d 668, 669, 159 Ill.Dec. 125, 575 N.E.2d 932, 933 (1991)) and such a finding must be supported by clear and convincing evidence (Allen, 172 Ill.App.3d at 956, 123 Ill.Dec. 184, 527 N.E.2d at 651). At the termination hearing, the trial court must determine whether termination of parental rights is in the best interests of the child. Lael v. Warga, 155 Ill.App.3d 1005, 1012, 108 Ill.Dec. 518, 508 N.E.2d 1095, 1100 (1987); In re D.L.W., 226 Ill.App.3d 805, 809, 168 Ill.Dec. 570, 589 N.E.2d 970, 973 (1992).
In the instant case, testimony at the termination hearing showed that J.G. had been in a new foster placement for the previous 10 months and that his foster parents wished to adopt him. J.G. seemed content in that home and was bonded to his foster parents. His behavior problems had markedly improved. As the trial court observed, J.G. is entitled to a stable home environment. Evidence clearly indicated that respondent would be unable to provide such an environment in the foreseeable future. Thus, the court did not err in terminating respondent's parental rights.
Finally, respondent argues the trial court erred in taking judicial notice of the court file without making the findings required by statute. Section 2-18(4)(a) of the Act provides in pertinent part:
"(4)(a) Any writing, record, photograph or x-ray of any hospital or public or private agency, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence or event, if the court finds that the document was made in the regular course of the business of the hospital or agency and that it was in the regular course of such business to make it, at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter." 705 ILCS 405/2-18(4)(a) (West 1994).
Respondent argues that the DCFS reports contained in the court file are hearsay and were not properly authenticated prior to the court taking judicial notice. A trial court may take judicial notice of matters of record in its own proceedings. In re J.R.Y., 157 Ill.App.3d 396, 400, 109 Ill.Dec. 673, 510 N.E.2d 541, 544 (1987). The admission of evidence is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. People v. Enis, 163 Ill.2d 367, 388, 206 Ill.Dec. 604, 645 N.E.2d 856, 865 (1994).
The State relies on language contained in this court's decision in A.T. There, the respondent did not object to the trial court *175 taking judicial notice of DCFS reports at the unfitness hearing, but argued for the first time on appeal that this was error. The opinion does not indicate the basis for respondent's argument; section 2-18(4)(a) of the Act was not cited in the opinion. This court found the issue waived, but stated that, absent waiver, we would find that the trial court did not err. We noted that a court may take judicial notice of matters of record in its own proceedings. The respondent had an opportunity on previous occasions to controvert the contents of the reports and did not do so. In addition, a large portion of the content of the reports were testified to at the termination hearing. Thus, we found that the trial court did not err, nor was the respondent prejudiced. A.T., 197 Ill.App.3d at 834-35, 144 Ill.Dec. 283, 555 N.E.2d at 411.
The language relied on by the State in A.T. is clearly dicta, since we found the evidence sufficient to support the trial court's order regardless of its reliance on the prior DCFS report. Upon further reflection, we conclude that it is necessary to clarify this issue. As a guide to the trial courts and counsel, we offer the following observations regarding the practice of taking judicial notice of all contents of the court file at a parental unfitness proceeding.
In the typical termination of rights case, the file has been open for at least a year and, frequently, much longer. During that period, the trial court will have conducted any number of review hearings and DCFS will have filed various service plans and reports with the court. These materials serve a vital function at the review hearings in assisting the court in determining whether a child may be returned home and the case closed, or whether the parent has failed to progress to the point where reunification is appropriate. These reports may contain hearsay. However, trial courts are allowed by statute at review hearings to consider all evidence relevant to determining the questions of (1) appropriateness of the permanency goal, (2) appropriateness of the service plan to achieve this goal, (3) appropriateness of the services contained in the plan and whether those services have been provided, (4) whether reasonable efforts have been made by all parties to the service plan to achieve the goal, and (5) whether the plan and goal have been achieved. 705 ILCS 405/2-28(2) (West 1996).
At an unfitness hearing, the trial court must necessarily take notice of certain facts relating to how the case has reached the point at which termination of parental rights is sought by the State. Thus, the court must know what steps the parent was supposed to have taken in order to achieve reunification with the child and when the clock began to run during which time the parent was required to take these steps. However, wholesale judicial notice of everything that took place prior to the unfitness hearing is unnecessary and inappropriate. The rules of evidence in civil cases apply to adjudicatory hearings under the Act (705 ILCS 405/2-18(1) (West 1996)), with a limited exception for hearsay, as contained in section 2-18(4)(a) of the Act (705 ILCS 405/2-18(4)(a) (West 1996)). Contrary to respondent's assumption, this exception applies only to adjudicatory proceedings. It would be illogical to apply the rules of evidence to adjudicatory hearings, the results of which may be only temporary, but not to apply those same rules to parental unfitness hearings, where the parent faces the ultimate sanction of the permanent and irrevocable loss of any rights to his or her child. In fact, this court has previously noted that the rules of evidence do apply to unfitness hearings. See In re M.S., 239 Ill.App.3d 938, 946, 179 Ill.Dec. 936, 606 N.E.2d 768, 773 (1992). There is no authority supporting the State's argument that the procedure followed by the trial court in this case was proper.
If the State wishes the trial court to take judicial notice of portions of the court file in a particular unfitness proceeding, the State can make a proffer to the court of the material requested to be noticed. Defense counsel should then be allowed an opportunity to object to the State's request. Such a procedure would serve to focus the trial court's attention on only those matters that are admissible under the rules of evidence, as well as make it easier for a reviewing court to determine what the trial court actually relied on in making its decision of unfitness. Above all, the trial court's decision as to *176 whether a parent is unfit should be based only upon evidence properly admitted at the unfitness hearing.
In the instant case, then, the trial court erred in taking judicial notice of the entire court file. However, respondent was not prejudiced by this error. There was more than sufficient evidence of respondent's unfitness properly admitted at the hearing to meet the State's burden of clear and convincing evidence.
For the reasons stated, the trial court's orders finding respondent to be an unfit parent and terminating her parental rights are affirmed.
Affirmed.
KNECHT and COOK, JJ., concur.