30 June 1999

NO. 4-98-0458

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In the Interest of H.C. and H.C., ) Appeal from

Minors, ) Circuit Court of

THE PEOPLE OF THE STATE OF ILLINOIS, ) Champaign County

Petitioner-Appellee, ) No. 96JA2

v. )

LISA HEAD, ) Honorable

Respondent-Appellant. ) Ann A. Einhorn,

) Judge Presiding.

_________________________________________________________________

JUSTICE COOK delivered the opinion of the court:

In January 1998, the circuit court of Champaign County adjudicated Lisa Head to be an unfit parent.  In April 1998, the court terminated her parental rights to her two-year-old son, H.C., and her one-year-old daughter, Ha.C.  Lisa appeals.

In January 1996, Lisa left her trailer home to do laundry, leaving three-month-old H.C. at home with his father, Terry C.  When she returned, H.C. had multiple bruises on his face.  Terry C. explained H.C. fell out of his grasp, hitting his face on a table and then the floor.  Terry C. admitted he might have pushed the child a little.  Lisa brought H.C. to the hospi­

tal, where he was examined by Dr. Basillio.  H.C. had several bruises on both sides of his face, but nowhere else.  Basillio stated the injuries might be consistent with falling and hitting his face on a table and floor.

The Illinois Department of Children and Family Services (DCFS) sought a second opinion from pediatrician Dr. Buetow.  She determined the injuries were not consistent with the parents'

state­ments as to how they occurred.  Buetow believed H.C. had been struck intentionally by an object, possibly a belt with a buckle.

Based on the injuries and the inconsistent statements by his parents, H.C. was taken into protective custody.  The

State filed a petition, alleging H.C. was neglected and abused by being in an environment that was injurious to his welfare.  DCFS filed a home and background report with the court in March 1996.  According to the report, Lisa dropped out of high school in the tenth grade and became pregnant when she was 17.  She later married Gary Head and had another child with him.  After several years, she and Head divorced and the custody of her two children was awarded to Gary.  Lisa continued to visit the children.  

Lisa started dating Terry C. in September 1994 and moved in with him in November 1994.  Lisa and Terry C. had an intertwined family relationship.  Lisa's twin sister was married to Terry C.'s brother, and Lisa's father was married to Terry C.'s mother.  H.C. was born to Lisa and Terry C. in September 1995.  At first, Lisa was in shock and disbelief at the allega­

tion that Terry C. had abused their son.

Terry C. had a history of criminality.  Terry C. had been arrested several times and had spent four different terms in prison for theft, burglary, forgery, and aggravated battery.  The aggravated battery conviction stemmed from a physical altercation where he injured a girl­friend.  Terry C. drank alcohol regularly and admit­ted using various drugs in the past.

In March 1996, the court adjudicated H.C. an abused minor.  At a dispositional hearing in April 1996, the court found that Terry C. had inflicted the physical abuse.  The court also found that Lisa was unfit to care for H.C. because:

"[s]he refuses to believe or even consider that the respondent father physically abused the respondent minor.  She is clearly more concerned with her relationship with the respondent father than the safety of the respondent minor."

H.C. was placed in foster care and Lisa was ordered to estab­lish and main­tain a regular course of visitation with H.C. and to fully cooperate with DCFS with respect to any recommended coun­

seling or parenting classes.

A review report, dated September 16, 1996, stated that Lisa and Terry C. still lived together and both had supervised visitations with H.C. twice a week.  H.C. always appeared happy to see Lisa and Terry C., especially Terry C.  Lisa only missed a few visitations, and those were because of car trouble and sickness.  Lisa com­plet­ed a psychological evaluation, a sub­

stance-abuse assess­ment, and was engaged in parenting education and counsel­ing.  Lisa's attendance at counseling sessions was sporadic and Terry C. did not attend any counseling.  The report concluded that both Lisa and Terry C. had made "very little progress towards attendance and completion of services."  Terry C. still denied he abused H.C.

Terry C. moved out of Lisa's trailer in early October 1996.  Lisa claimed Terry C. no longer lived with her because of the injuries to H.C. and so that she would not lose custody of her next child, Ha.C.  Lisa gave birth to Ha.C. shortly after Terry C. moved out.  Terry C. was also the father of Ha.C.  A supplemental petition was filed, alleging Ha.C. was neglected and abused.  The court found probable cause to believe the petition and ordered DCFS to be Ha.C.'s temporary guardian.  

In January 1997, a review report stated that Lisa acknowledged that Terry C. was responsible for H.C.'s injuries, but she was not sure whether they were accidental or intention­al.  She stated she would not let Terry C. have unsupervised contact with the children if they were returned to her.  Terry C. still denied he abused H.C. and did not attend counseling.  

Meanwhile, H.C. and Ha.C. were adjusting well in the foster home of Loren and Cheryl Engstrom.  The Engstroms already had six biological children living at home.  A DCFS report stated Cheryl seemed to derive a great deal of pleasure in her role as protec­tor of H.C. and Ha.C., and the Engstroms took a very active role in the children's case.  From the begin­ning, the Engstroms seemed against the idea of the children returning home to their parents.  Cheryl told a DCFS worker before H.C. and Ha.C. were placed with her that she "did not like working with natural parents."  Also, she could not understand why DCFS decided to use her home if they intended to reunite Lisa with her chil­dren.  Cheryl was also angry that DCFS was not seeking or using her input about Lisa's parenting capacity.

In December 1996, the Engstroms wrote a letter to the judge, stating a DCFS caseworker told them that DCFS planned to return the children to Lisa in February 1997.  The Engstroms were concerned that DCFS was "rushing to accomplish this goal" and that the children's best interests would not be met.  Pursuant to the Engstroms' request, the judge appointed Barbara Powell as  court-ap­pointed special advocate (CASA) to H.C. and Ha.C.  

A DCFS review report, dated April 23, 1997, stated Lisa had made "tremendous progress" since the last report.  She had completed parenting classes, maintained housing and employment, and attended all of her counseling sessions and visitations.  Lisa's visits were very interactive with her children.  Terry C. also resumed visitation with the children, and appeared to be "very bonded" with H.C. and Ha.C.  However, Terry C. still refused to participate in counseling.  

In May 1997, the State filed a petition seeking termi­

nation of Terry C.'s parental rights.  Terry C.'s parental rights were terminated in September 1997.

In August 1997, a DCFS review report stated Lisa was pregnant again and due to deliver in late December 1997.  Lisa claimed Terry C. was not the father.  (The father was later stated to be Chris Anderson.)  The Engstroms ex­pressed their desire to take Lisa's unborn child into their family should the court decide to remove the child at birth.  

Another DCFS review report, dated October 9, 1997,   showed that Lisa had continued her progress, completing all of the recom­mend­ed coun­sel­ing and maintaining visitation with her chil­dren.  Lisa claimed she understood that Terry C. could not be around H.C. and Ha.C. and that she would not jeopardize getting her children back by being associated with him.  The report stated "[i]t is clearly evident that [Lisa] loves her children and wants them home."  The report recommended Lisa be granted unsu­pervised extended over­night and weekend visitation. 

On October 15, 1997, CASA Powell wrote to the judge that H.C. and Ha.C. had become attached to the Engstroms.  Powell also believed Lisa's new pregnancy would impact her ability to care for H.C. and Ha.C.  Finally, Powell was con­cerned about evidence that suggested Lisa was still seeing Terry C.

On October 21, 1997, the State filed a petition seeking termination of Lisa's parental rights, alleging she had failed to make reasonable progress toward the return of her children and had failed to make reasonable efforts to correct the conditions that were the basis of the removal of the children.

An adjudicatory hearing was held in January 1998.  The court took judicial notice of Lisa's file and previous proceed­

ings "to the extent that they meet the evidentiary requirements of this hearing."  Various caseworkers testified as to Lisa's progress, including Jennifer Bogner, Norman Lambert, Marilyn Walker, and Gladys Hunt.  Essentially, the caseworkers testified Lisa had successfully completed the DCFS programs and had ac­

knowledged, after some initial reluctance, that Terry C. was respon­sible for H.C.'s abuse.  Lisa informed the caseworkers she no longer had a sexual relationship with Terry C. and would not let him around her children.

The State also presented evidence of Lisa's contacts with Terry C.  Walker testified that in October 1997, Lisa visited Terry C. twice while he was in the county jail.  Lisa claimed she only went there to inform Terry C. that his mother (Lisa's stepmoth­er) had been hospitalized from a stroke and that his nephew was having his kidney removed.  In April 1997, Lisa was at her sister's house and Terry C. showed up.  Lisa started having back pains, so Terry C. drove her to the hospital.  In August 1997, Cheryl spotted Lisa and Terry C. together at Meijer department store, where Lisa worked.  Cheryl took a picture of them togeth­er in the parking lot.  At first, Lisa lied to her case­worker about seeing Terry C. at Meijer, but later admitted seeing him there more than once.  Cheryl also spotted Lisa and Terry C. togeth­er at a local gas station and informed DCFS.  Lisa claimed her car broke down and Terry C. came to help fix it.  Lisa claimed Cheryl was stalking her and she did not feel safe.

Lisa testified she had not had a sexual relationship with Terry C. in 1997, and he was not the father of her newborn child.  Lisa stated she would not pursue a relationship with Terry C. in the future.  She stated he posed a risk to her children and she did not want him to have unsupervised contact with them.  Lisa admitted lying about seeing Terry C. at the department store because she was afraid it might hurt her chances of getting her children back.  She testified she had not contact­

ed him in prison, where he was currently serving a two-year sentence.

The trial court found in favor of the State, holding Lisa was unfit because she failed to make reasonable progress within 12 months of the adjudication of neglect and because she failed to make reasonable efforts to correct the conditions which were the basis for the removal of her children.  The court stated it did not matter that Lisa completed the checklist of DCFS services because she still maintained contact with Terry C.  Lisa's parental rights to H.C. and Ha.C. were terminated on April 7, 1998.  

Lisa gave birth to D.P. in December 1997.  The State subsequently filed a petition alleging D.P. was ne­glect­ed and abused based on Lisa's contacts with Terry C.  That case has pro­

ceed­ed under another judge and is separate from this appeal.

Lisa appeals, arguing the court erred in finding her unfit.  An appellate court will not set aside a trial court's finding of unfitness unless it is contrary to the mani­fest weight of the evidence.  
In re T.B.
, 215 Ill. App. 3d 1059, 1062, 574 N.E.2d 893, 896 (1991).  
A parent is deemed unfit if the State can show by clear and con­vincing evidence that the parent failed to make "reasonable progress" toward the return of his or her child.  
750 ILCS 50/1D(m) (West 1996); 
In re M.W.
, 199 Ill. App. 3d 1050, 1053, 557 N.E.2d 959, 961 (1990).  The stan­dard for "rea­sonable progress" is an objec­tive one.  
In re A.P.
, 277 Ill. App. 3d 592, 598,
 660 N.E.2d 1006, 1011 (1996).  "Rea­son­able prog­ress" exists when a parent shows a minimum measur­able or demon­strable move­ment toward the return of his or her child.  
A.P.
, 277 Ill. App. 3d at 598, 660 N.E.2d at 1011.  A court should not make a finding of reason­able prog­ress unless the evidence shows the parent's conduct is improving and will soon comply with ordered direc­tives.  
In re L.L.S.
, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). 

After Lisa's children were removed, she was instructed to maintain visitation with them and to attend any recommended parenting classes and counseling sessions.  The court did not order Lisa to stay away from Terry C., although she was told by a caseworker that contact with Terry C. would jeopardize her chances of getting her children returned.

Based solely on the evidence and testimony produced at Lisa's fitness hearing, we conclude the trial court's finding of parental unfitness was contrary to the manifest weight of the evidence.  Cer­tain­ly, Lisa made reason­able prog­ress with respect to DCFS-recom­mend­ed servic­es.  Various case­workers testified Lisa successfully com­pleted DCFS programs.  Lisa was coopera­tive with her visita­tion sched­ule, always attend­ing and calling to confirm 24 hours in advance.  The children bonded with Lisa and were comfort­able while visiting in Lisa's home.

Lisa's completion of services is commendable.  Howev­er, Lisa's chil­dren were not removed because of poor parenting skills or lack of interest in her children.  Lisa's children were removed because she exposed them to danger by leaving H.C. in Terry C.'s care and refusing to "even consider" that Terry C. had abused the child.  Therefore, to make reasonable efforts to correct this condition, Lisa needed to acknowledge that Terry C. may have abused H.C. and to take steps to ensure it would not happen again.

Lisa testified at the fitness hearing she knew Terry C. pre­sent­ed a risk to her children and she did not want him to have unsuper­vised visitation with the children.  She stated she would not let Terry C. have unsuper­vised contact with the children if they were returned to her.  By ac­knowledging the possi­bility that Terry C. abused H.C., Lisa took the first step toward cor­recting her situation.  We recognize Lisa could have more force­fully stated that Terry C. did, in fact, abuse H.C.  However, we find Lisa's stance was not unreasonable considering she was not present when H.C. was injured, no evidence showed Terry C. had ever been violent with a child before or since the incident, and the first doctor to examine H.C. stated the injuries 
may
 
have
 
been
 consis­tent with Terry C.'s explanation.  We conclude that Lisa's stating Terry C. was a risk and should not have unsuper­

vised visitation with the chil­dren showed some progress.

Having accepted that Terry C. was a risk, Lisa also needed to make reasonable efforts to alleviate that risk.  Since Terry C. never admitted he abused H.C., that risk could never be allevi­ated so long as Terry C. lived with Lisa or maintained an intimate relationship with her.

Terry C. moved out of Lisa's trailer in October 1996.  No evidence suggests Terry C. moved back in with Lisa or spent the night with her since he moved out.  Lisa testified she had not been sexually intimate with Terry C. in all of 1997, and that she would not pursue a relationship with him in the future.  Based on Lisa's diligent cooperation with DCFS, her acknowledge­

ment that Terry C. was a risk to her children, and the uncontra­

dict­ed evidence that Lisa is no longer living with or dating Terry C., Lisa made reason­able efforts to correct the condi­tion that was the basis of the removal of the children.

However, the trial court came to the opposite conclu­

sion based on five separate contacts Lisa had with Terry C. during 1997, and her lies about one of the contacts.  The court per­ceived that Lisa was insincere about her relationship to Terry C. and could not be trusted to keep her children safe from Terry C. or other alcoholic abusers.  The court found she was unable to set boundaries with respect to Terry C. and was too accommodating to everyone around her.

We conclude the trial court's determination was mani­

festly erroneous.  We fail to see how Lisa's brief and public  con­tacts with Terry C. somehow nullifies the proved and demon­

strable efforts she has made to cooperate with DCFS, bond with her children, and remove Terry C. from her home.  Admit­ted­ly, Lisa's efforts would be mean­ing­less if evi­dence clearly showed she was still romantically involved with Terry C. and her "prog­

ress" was fraudulent.  However, the evidence falls far short of proving that.  The State did not produce any witness or evi­dence indicat­ing Lisa still lived with Terry C. or was inti­mately in­

volved with him.  The evidence of Lisa's encounters with Terry C. proves only that she was seen with Terry C. in public on a handful of occasions over a one-year period.  Other people were present during these inci­dents, but the chil­dren were not.  A finding that Lisa was present with Terry C. in public does not amount to a finding that she would bring the chil­dren around Terry C.  It certainly does not mean she would ever leave her chil­dren alone with him.  The equivocal evidence of contacts does not out­weigh the tangi­ble efforts Lisa has demonstrat­ed, nor does it amount to the clear and con­vinc­ing evi­dence needed to overcome the presump­tion of paren­tal fit­ness.

Our decision to reverse the trial court's determi­nation of parental unfitness is not made lightly.  We recognize the trial court's findings should be given great deference since its oppor­tu­nity to evalu­ate the parties and their testimony is superior to the reviewing court's opportunity.  
In re Pronger
, 118 Ill. 2d 512, 526, 517 N.E.2d 1076, 1081 (1987). However, we also recog­nize that parental rights and responsibili­ties are of deep human impor­tance and should not be lightly terminat­ed.  
In re Paul
, 101 Ill. 2d 345, 351-52, 461 N.E.2d 983, 985 (1984).  In the present case, no evidence showed Lisa has ever abused or ne­

glect­ed her children.  The record clearly shows she loves her chil­dren and they are bonded to her.  After her children were removed, she attended all DCFS classes and visitations and was able to articu­late her need to be assertive and the importance of protecting her children from abuse.  She acknowledged that Terry C. presented a risk to her children and no longer lives with Terry C.  We are also mindful that H.C. and Ha.C. have spent a great deal of their lives with the Engstroms, and the Engstroms are in a better financial position to care for the children.   Al­though it is tempt­ing to affirm the trial court's decision based on this factor, we are duty bound to ignore it.  When the State seeks to terminate the parental rights of a parent, the court must deter­mine the parent's unfitness 
before
 it may proceed to a consider­ation of the child's best interests.  
In re Adoption of Syck
, 138 Ill. 2d 255, 276, 562 N.E.2d 174, 183 (1990).  The Engstroms may be wonder­ful par­ents, but H.C. and Ha.C. are 
Lisa's
 chil­dren.  Before her paren­tal rights may be terminat­ed, the law affords her the opportunity to make reason­able efforts to correct the condi­tions that caused the removal of the children.  We conclude the only fair and reason­able view of the record shows she made those efforts.

Finally, the behavior of the foster par­ents, the Engstroms, deserves comment.  On one hand, the Engstroms should be ap­plaud­ed for their efforts in providing a stable and nurtur­

ing home for H.C. and Ha.C.  On the other hand, we are concerned that their zeal in protecting the children may have unduly interfered with the reunification of the family and the ultimate best interests of the children.  The primary goal of the Juvenile Court Act of 1987 (705 ILCS 405/1-1 
et
 
seq
. (West 1996)) is to strength­en family ties whenev­er possi­ble and to reunify the original fami­ly.  
Johnson v. Burnett
, 182 Ill. App. 3d 574, 582, 538 N.E.2d 892, 897 (1989).  Howev­er, Cheryl made it clear from the begin­ning she did not want the children reunit­ed with Lisa, but wanted the children perma­nently placed with her family.  If not for Cheryl's behind-the-scenes efforts and constant opposi­

tion to Lisa's case, the children might already be with their natural mother.  Whether that is where the children proper­ly belong remains to be seen.  Regard­less, DCFS and foster fami­lies should keep in mind that "[t]he role of the foster parent, as envisioned by Illinois law, is that of a temporary way station on the road of a child's life until the difficulties at home can be straight­ened out."  
Johnson
, 182 Ill. App. 3d at 582, 538 N.E.2d at 897.

The State fell far short of proving Lisa unfit by clear and convincing evidence; therefore, we reverse the judgment of the trial court terminating her parental rights.

I
t is difficult to deter­mine what evidence was consid­ered by the trial court in these cases, where the trial court takes judicial notice of unspecified materials, and the briefs filed by the parties discuss all the evidence presented at the hearings.  The dissent complains that "the majority reverses Judge Einhorn based on evidence she never even heard."  Slip op. at 17.  That is incorrect.  Our reversal is based solely on the evidence and testimony produced at the fitness hearing.  We do attempt to put the facts of this case into context, for example by discuss­ing the January 1996 incident that precipitat­ed these proceed­ings.  It is difficult to believe that the trial court was unaware of those facts.  Al­though we refer to prior hearings and the orders entered in those proceed­ings, everything of any importance at those hearings was present­ed to the court at the fitness hearing in one way or another.  The dissent does not suggest that our decision is wrong on the merits.  The dissent com­plains only of our method in this case and does not identify any important evidence that was not proper­ly before Judge Einhorn at the fitness hearing.  Indeed, if some important evidence was not presented at the fitness hear­ing, we should ask why it was not presented.  Final­ly, the strict rules of evi­dence at fitness hearings are designed to protect those whose parental rights are being termi­nated, not to protect trial courts from reversal.

Reversed.

McCULLOUGH, J., concurs.

STEIGMANN, J., dissents.

JUSTICE STEIGMANN, dissenting:

Perhaps the most fundamental rule of appellate review is that an appellate court reviews trial court judgments based only upon the evidence presented at the trial level.  See 
People v. Reimolds
, 92 Ill. 2d 101, 106-07, 440 N.E.2d 872, 875 (1982).  Thus, in deter­mining whether a trial court judg­ment was cor­rect, this court should not consider evidence the trial court never heard.  Because the majority opinion violates this funda­mental rule, I respectfully dissent.

I. THE MAJORITY'S CONSIDERATION OF EVIDENCE 

NEVER PRESENTED AT THE FITNESS HEARING

In January 1998, Judge Ann Einhorn adjudi­cated Lisa to be an unfit parent.  In April 1998, Judge Einhorn termi­nated Lisa's paren­tal rights to her two children, and Lisa appeals that termi­nation.  The cor­rectness of the trial court judgment termi­

nating Lisa's paren­tal rights, which arose out of the January 1998 fitness hearing, is the only issue before us on appeal.  Accord­ingly, when review­ing that judgment, this court must limit itself to the evidence pre­sented at that fitness hearing.  Regret­tably--and inexplicably--the majority has refused to do so.

As shown by the attached appendix, the majority opinion is riddled with references to "evidence" Judge Einhorn never heard at the January 1998 fitness hearing.  This other informa­

tion is taken from earlier stages in the juvenile court proceed­

ings involving Lisa and her children, such as DCFS reports and evi­dence pre­sent­ed at review hearings after the children were removed from Lisa's custo­dy. The majority's consider­ation of such "evidence" consti­tutes particu­larly egre­gious error that can only confuse practitioners and litigants, even if the majority merely refers to it as "background."  

First, the strict rules of evi­dence apply at all fitness hear­ings, including the one we are supposed to be review­

ing.  See 
In re M.S.
, 239 Ill. App. 3d 938, 946, 606 N.E.2d 768, 773 (1992).  In contrast, 
no
 rules of evi­dence limit the admis­si­

bility of infor­mation pre­sented at review hear­ings.  Section 2-28 of the Juve­nile Court Act of 1987 (Act) (705 ILCS 405/2-28 (West Supp. 1997)) provides that at review hear­ings, "[a]ll evidence relevant to determining [ques­tions regarding a child's place­

ment], includ­ing oral and written reports, may be admitted and may be relied on to the extent of their probative value."  Thus, by considering review reports and other informa­tion presented in earlier stages of these proceed­ings, the majority not only fails to limit itself to the evidence actually presented at the fitness hearing, but the majority does not even limit itself to the evidence that could have been admitted at that hearing.

Second, Judge John DeLaMar con­duct­ed almost all of the earlier juvenile court proceedings from which the majori­ty obtains the informa­tion it consid­ers on appellate review.  However, Judge Einhorn, not Judge DeLaMar, presid­ed at the January 1998 fitness hearing.  Thus, even though it would have been error for Judge Einhorn to have consid­ered information presented at the earlier review hearings, at least she would have heard it; in this case, the majority reverses Judge Einhorn based on evi­dence she never even heard.  

II. THE PROPER SCOPE OF JUDICIAL NOTICE IN TERMINATION CASES

 The majority opinion contains the following statement:  "An adjudi­catory hearing was held in January 1998.  The court took judicial notice of Lisa's file and previous pro­ceedings `to the extent that they meet the eviden­tia­ry re­quire­ments of this hearing.'"  (Slip op. at 6.)  Surely the majori­ty's reference to judicial notice cannot be the basis upon which it con­tends that all of the otherwise inad­missi­ble informa­tion Judge DeLaMar heard regarding Lisa and her children 
prior
 to the fitness hearing could somehow be (1) viewed as evi­dence properly before Judge Einhorn at the fitness hearing, (2) relied upon by Judge Einhorn in her ruling, or (3) appropri­ately consid­ered by this court when we review Judge Einhorn's ruling.

Indeed, our recent decision in 
In re J.G.
, 298 Ill. App. 3d 617, 629, 699 N.E.2d 167, 175 (1998), should have put to rest the issue of "judicial notice of prior pro­ceedings" as a basis for a claim that the trial court--
or
 
this
 
court
--could consid­er other­wise inad­missible material when resolv­ing (or reviewing) the issue of parental fitness.  In that case, this court wrote that al­though the trial court must necessar­ily take notice of certain facts relat­ing to how a juvenile case has reached the point at which a fitness hearing is being held, "whole­sale judicial notice of every­thing that took place prior to the unfitness hearing is unneces­sary and inappro­priate."  
J.G.
, 298 Ill. App. 3d at 629, 699 N.E.2d at 175.  Sig­nif­i­cantly, in 
J.G.
, we concluded as follows:  "Above all, the trial court's deci­sion as to whether a parent is unfit should be based only upon evi­dence properly admitted at the unfitness hearing."  
J.G.
, 298 Ill. App. 3d at 629, 699 N.E.2d at 175-76.  See also 
In re C.M.
, No. 4-98-0823, slip op. at 18-19 (May 28, 1999), ____ Ill. App. 3d ____, ____, ____ N.E.2d ____, ____, where this court cited 
J.G.
 and wrote the following:

"We have previously held that a court's find­

ings in an adjudicatory hearing on a petition to terminate parental rights must be based only upon the evidence presented during that hearing.  [Citation.]  By relying instead on evidence presented at a different hearing, nearly five years in the past, the court erred."

III. THE PROPER SCOPE OF REVIEW IN TERMINATION CASES

In this appeal, this court's focus must be 
solely
 on the evi­dence the trial court heard at the fitness hearing because we are reviewing only the judg­ment arising from that hearing.  If the State did not present sufficient evidence to meet its burden at that hearing, we should reverse.  However, we ought not reverse a trial court based upon "evidence" it never heard.  As this court has previously written:

"[T]his is a court of 
review
, mean­ing we are supposed to be 
reviewing
 the evi­dence pre­

sented to the trial court and its rulings and findings thereon.  No citation is neces­sary for the proposition[] of law that *** a party who has failed to present evi­dence at the trial level *** may not overcome that defi­

ciency by presenting that evidence to the court hearing the case on appeal."  (Emphasis in original.)  
L.L.S.
, 218 Ill. App. 3d at 465, 577 N.E.2d at 1389.

Consistent with its concerns that the rules of evi­dence be appropriately applied in juvenile court proceedings, the General Assembly has recently amended section 2-18 of the Act, enti­tled "Evidence," by adding the following: 

"In any hearing under this Act, the court may take judicial notice of prior sworn testimony or evidence admitted in prior pro­

ceedings involving the same minor 
if
 (a) the parties were either represented by counsel at such prior proceedings or the right to coun­

sel was knowingly waived and (b) 
the
 
taking
 
of
 
judi­cial
 
notice
 
would
 
not
 
result
 
in
 
admit­

ting
 
hearsay
 
evidence
 
at
 
a
 
hearing
 
where
 
it
 
would
 
otherwise
 
be
 
prohibited
."  (Emphasis added.)  705 ILCS 405/2-18(6) (West 1998) (as amend­ed by Pub. Act 90-608, §30, eff. June 30, 1997 (1998 Ill. Legis. Serv. 1575, 1604)).  

This change predates the sound decision of this court in 
J.G.
 concerning limits upon a court's taking judicial notice in juve­

nile court proceedings--the decision that the majority in this case disregards.

The following two scenar­ios demonstrate the inappropri­

ateness of the majority's approach in this case:

(1)  Defendant Jones is convicted of a felony offense in a bench trial before Judge Brown.  On ap­peal, Jones argues that the evidence was insufficient to sustain his conviction, and in support of that argument, he cites allegedly exculpatory evidence that Judge Brown heard when he conducted Jones' prelimi­nary hearing.  How­ever, for whatever reason, that evi­dence was not pre­sented at tri­al.

(2) In a civil bench trial, Judge Brown finds in favor of the defendant and rejects plaintiff Smith's argument that Smith's inju­

ries were due to the defendant's negligence.  On appeal, Smith argues that Judge Brown's deci­sion was contrary to the manifest weight of the evidence and a new trial is required.  In support of that argument, Smith cites the factual aver­ments con­tained in affidavits and depositions present­ed to--and considered by--

Judge Brown when he ruled on and denied the parties' respective motions for summary judg­

ment prior to trial.  Howev­er, for what­ever reason, the cited affidavit and deposi­tion evi­dence was not pre­sent­ed at the bench tri­

al. 

 Surely each of my colleagues in the majori­ty would reject both of the above argu­ments and ­follow the fundamental rule that in reviewing the trial court's judgment, this court must re­strict itself to consid­ering only the evidence actual­ly before the court at trial, not any pretrial material never presented at trial.  Yet, no princi­pled basis exists to distin­

guish the above two scenarios from the present case, in which the majority reverses the trial court's decision to terminate paren­

tal rights based upon evidence 
never
 
presented
 at the fitness hear­ing.  

IV. PREPARING THE RECORD AND BRIEFS IN TERMINATION CASES

Counsel can assist the reviewing courts in termination cases by focusing their attention, and thereby ours, on those parts of the record--and only those parts of the record--which are salient to the judgment for which review is sought.  

Counsel should avoid beginning the statement of facts with the first involvement of DCFS, which led in turn to the shel­ter-care hearing, the petition for adjudication, the hearing thereon, the dispositional hearing, and each and every review hearing, culminating with the filing of the petition for termi­

nation and the adjudicatory and best interests hearings thereon.

Instead, counsel should proceed as follows:

(1) begin with an overview of the trial court orders predat­ing the petition to termination parental rights (see, 
e.g.
, 
C.M.
, slip op. at 2-4, __ Ill. App. 3d at __, __ N.E.2d at __ (describing the trial court proce­dures leading up to the petition to terminate parental rights); 

(2) lay out the allegations of the petition to termina­

tion (see, 
e.g.
, 
In re D.M.
, 298 Ill. App. 3d 574, 577, 699 N.E.2d 212, 214 (1998));

(3) summarize the evidence presented at the adjudica­

tory hearing on the termination petition, including the 
specific
 items of evidence that the State asked the court to take judicial notice of and the court's rulings thereon (see, 
e.g.
, 
In re R.G.
, 165 Ill. App. 3d 112, 115-26, 518 N.E.2d 691, 693-700 (1988)); and

(4) summarize the evidence presented at the best interest hearing, if pertinent (see, 
e.g.
, 
D.M.
, 298 Ill. App. 3d at 578-79, 699 N.E.2d at 215-16).

In preparing the record on appeal, counsel should include the tran­scripts of the hearings referred to in (3) and (4) and those specif­ic items of which the trial court took judicial notice.  In short, counsel should focus on the evidence presented at the hearing on the partic­ular judgment on appeal.

V. CONCLUSION

Cases involving the termination of parental rights are difficult and emotional, made no less so by their ever-increasing number in the Illinois judicial system.  Given the stakes in­

volved, all parties deserve the best that this system can deliv­

er.  Regrettably, the majority opinion falls far short of that mark.  That opinion, if left to stand, will serve only to confuse the bench and bar in this important area.  I can only hope that the supreme court will review this decision, reverse it, and rein­state the funda­men­tal rule of appellate review that the appel­late court must limit itself, when reviewing trial court judgments, to consid­ering only the evi­dence before the trial court when the judgment was entered.

APPENDIX

(
Bold letters
 indicate which judge presided 

at the relevant stage of the proceedings)

1. The majority describes in detail a January 1996 incident that led to the placement of H.C. into shelter care, including a discussion of two different doctors' examinations of H.C. and their conclusions.  Slip op. at 1-2.  However, the trial court heard no evidence about this incident at the fitness hearing.  The court's shelter-care order states only that "a physician" concluded that the bruises were inconsistent with a fall.  (
Judge DeLaMar presided at the shelter-care hearing
.)

2. The majority discusses respondent's family history and how she met Terry C.  Slip op. at 2.  Although testimony at the fitness hearing established the "intertwined family relation­

ship" between respondent and Terry C. that the majority de

scribes, no party at the fitness hearing presented evidence on how and when the two met. (
Judge DeLaMar received the home and background report upon which the majority relies and presided at the April 1996 dispositional hearing.
)

3. The majority quotes a September 1996 review report as saying that respondent and Terry C. had made "`very little prog­ress towards attendance and completion of services.'"  Slip op. at 3.  That report, however, was not admitted into evidence at the fitness hearing and is likely inadmissible hearsay.  (
Judge DeLaMar presid­ed at the Septem­ber 1996 review hearing
.)

4. The majority states that in January 1997, "[Terry C.] still denied he abused H.C. and did not attend counseling."  Slip op. at 4.  No evidence at the fitness hearing supports this statement.  (
Judge DeLaMar presided at the January 1997 dispositional hearing
.)

5. The majority includes an extensive discussion of how H.C. and Ha.C. adjusted to their foster home, what sort of household the foster parents provided for the children, and what sort of attitude the foster parents exhibited toward the original goal of returning the children to respondent.  This discussion includes a quotation from a letter that the foster mother wrote to the trial judge.  Slip op. at 4-5.  However, at the fitness hearing, the trial court heard no evidence on this topic.  In addition, the letter quoted by the majority, which was not admitted into evidence at the fitness hearing, was addressed to a different trial judge than the one who presided over the fitness hearing.  (
Judge DeLaMar presided at the March 1997 review hearing
.)

6. The majority quotes an April 1997 review report as saying that respondent had made "`tremendous progress'" and that Terry C. was "`very bonded'" with the children.  Slip op. at 5.  That review report was not entered into evidence at the fitness hearing, and although caseworkers testified regarding respon

dent's progress, the court heard no evidence regarding Terry C.'s visits.  (
Judge DeLaMar presided at the May 1997 review hearing
.)

7. The majority discusses the contents of August 1997 and October 1997 review reports.  Slip op. at 5-6.  Although the information that the majority derives from those reports ended up in evidence at the fitness hearing, the reports themselves were not admitted into evidence.  Despite that fact, the majority quotes from and refers directly to the conclusions of the October 1997 review report.  Slip op. at 6.  (
Judge Einhorn presided at the October 1997 review hearing
.)

8. The majority discusses a letter written from CASA Powell to the trial court in October 1997.  Slip op. at 6.  However, that letter was not admitted into evidence at the fitness hearing.  (
Powell's letter was addressed to Judge Einhorn
.)

9. The majority describes an incident involving respon­

dent and Terry C. when the foster mother purportedly saw them together at Meijer.  Slip op. at 7.  The foster mother herself did not testify at the fitness hearing, so it is unclear how the majority knows what she saw.  (
Judge Einhorn presided at the October 1997 review hearing
.)