*In re* S.E., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Bernice Black, Respondent-Appellant).—*In re* L.H., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Bernice Black, Respondent-Appellant).

Fourth District   Nos. 4—00—0767, 4—00—0768 cons.

Opinion filed April 5, 2001.

Baku Patel, Public Defender, of Danville (Kimberly Edwards, Assistant Public Defender, of counsel), for appellant.

Larry S. Mills, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

In August 2000, the trial court entered a permanency review order, pursuant to section 2—28 of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2—28 (West Supp. 1999)), changing the permanency goal for L.H. (born August 18, 1993) and S.E. (born September 22, 1998), the minor children of respondent, Bernice Black, to substitute care pending the court's decision on termination of parental rights. Respondent appeals, arguing that (1) the court's decision to change the permanency goal was against the manifest weight of the evidence, and (2) the court erred by failing to indicate in writing its reason for changing the permanency goal, pursuant to section 2—28(2) of the Act (705 ILCS 405/2—28(2) (West Supp. 1999)). We affirm.

## I. BACKGROUND

The record before us establishes the following. In December 1998, the State filed a petition for adjudication of wardship, alleging that respondent failed to provide a clean, safe, and healthy home environment in that she and S.E.'s father, Clarence Ewing, were intoxicated to the point of being unable to supervise L.H. and S.E. and had a history of failing to provide for respondent's children due to substance abuse. 705 ILCS 405/2—3(1)(a) (West 1998). Following a hearing, the trial court entered an order granting temporary custody of L.H. and S.E. to the Illinois Department of Children and Family Services (DCFS).

In January 1999, the trial court conducted an adjudicatory hearing at which respondent stipulated to the facts contained in the State's petition. After a February 1999 dispositional hearing, the court made L.H. and S.E. wards of the court and ordered respondent to cooperate with DCFS and any services recommended by DCFS. The court further ordered respondent and Ewing to (1) attend and participate in alcohol-abuse treatment, parenting education classes, and domestic-violence programs; and (2) submit to psychological and psychiatric evaluations. DCFS set a permanency goal of returning L.H. and S.E. home.

According to a permanency review hearing report filed in the trial court in September 1999, respondent had made minimal progress as

an outpatient at the Prairie Center. She had tested positive for alcohol and cocaine within the previous six months and had been terminated from participating in group sessions for violating confidentiality rules. She was participating in parenting classes and had completed a psychological evaluation.

In October 1999, the trial court conducted a permanency review hearing and determined that the permanency goal would remain return home.

According to a status review report filed in December 1999, respondent and Ewing had both been terminated from drug and alcohol treatment at the Prairie Center for nonattendance or uncooperative behavior. Respondent admitted to Dennis Gaugler, the DCFS caseworker assigned to her case, that she continued to drink and had tested positive for cocaine within the previous six months. Respondent had completed parenting classes and the psychological and psychiatric evaluations. The psychologist reported that respondent either did not understand the seriousness of her problems or did not wish to understand them. She had not obtained suitable housing despite the help of a home interventionist and was not employed.

The report also showed that S.E. and L.H. continued to live in the foster home where they had lived for one year. S.E. was thriving. L.H. was struggling academically but was receiving additional assistance from the school and her foster parents, who were tutoring her at home.

A permanency review report filed on May 15, 2000, showed that respondent had completed the intensive phase of alcohol- and substance-abuse treatment at New Directions Treatment Center (New Directions) and was participating in aftercare treatment. She had not entered into a domestic-violence program, and she had not found suitable housing. Ewing had not entered substance-abuse or alcohol treatment and had been drinking prior to one of his visits with L.H. and S.E. DCFS recommended that the trial court change the permanency goal to substitute care pending the court's decision on termination of parental rights.

A letter from James Calvert, the executive director of New Directions, was also filed in May 2000. Calvert reported that respondent had been doing well in treatment but manifested a sudden change in attitude and behavior after Ewing had been released from prison. Her attendance dropped, her grooming ceased, and she stopped attending support group meetings and church.

At the June 2000 permanency review hearing, Gaugler testified that L.H. and S.E. had been in the same foster home for 17 months and were doing very well. Their foster parents were interested in

adopting them. Calvert testified that respondent's participation in the aftercare phase of her drug treatment had become inconsistent after Ewing's release from jail. Respondent had stopped spending time with sober individuals and was spending time with drug users. When she attended treatment she was not attentive. Gaugler concluded that she had a high potential for relapse. At the conclusion of the hearing, the trial court ruled that the permanency goal would remain return home.

In a status report filed on August 1, 2000, DCFS again recommended that the permanency goal be changed to substitute care pending the court's decision on termination of parental rights and filed another letter from Calvert along with the report. According to Calvert, respondent was not responding appropriately to treatment and very seldom participated in group discussions. Her attendance was inconsistent and it appeared to him that she attended the aftercare treatment only to appease the court and DCFS. His agency had been working with respondent since December 1999, and she still had not obtained housing. Calvert also expressed concern that respondent remained in a relationship with Ewing.

At the August 4, 2000, permanency review hearing, Gaugler testified that DCFS sought to change the permanency goal for the following reasons: (1) Calvert's report regarding respondent's substance-abuse treatment was not favorable, and she had been in treatment for several months; (2) in June 2000, Ewing battered respondent, requiring stitches in her lip; and (3) respondent and Ewing had not obtained suitable housing. In Gaugler's opinion, respondent had not made substantial progress on her goals.

Gaugler further testified that respondent had been looking for housing since L.H. and S.E. were removed. She had been offered housing three times but did not have $230 to make a down payment. He explained that DCFS funds are not available to help with housing unless the children are to be returned within 60 days. Because L.H. and S.E.'s return home was not certain, DCFS housing funds were not available for respondent.

Mary Dickenson, the home interventionist supervisor with the Center for Children Services, testified regarding respondent's efforts to obtain housing. Dickenson, who had been involved with respondent's case since December 1997, stated that a couple of weeks before the August 2000 hearing, the Danville Housing Authority had contacted respondent about available units. Respondent was told that she would need about $234 for a deposit within two days to secure an apartment. Respondent was not able to come up with the money. This had happened on more than one occasion. Dickenson had advised respondent to put money aside for a deposit. She understood that respondent

received close to $500 per month in social security benefits and that Ewing worked.

Ewing testified that respondent and he were staying with his sister and that their only expenses were $150/month in food, transportation, and rent expenses. He had recently obtained a full-time job and was earning $8 an hour. Ewing also testified that respondent did not have the money for the housing deposit because she had to pay $339 to the housing authority on a past debt. He further testified that at various times Gaugler and Dickenson failed to keep their word to respondent and provide her with the help that they had promised.

After considering the evidence and the arguments of counsel, the trial court entered an order changing the permanency goal to substitute care pending the court's decision on termination of parental rights. The court explained its ruling, in pertinent part, as follows:

"There's been absolutely no participation by these parents in order to try to get themselves out of their situation and into some stable housing. They knew that from the get go $309 [*sic*] was needed to be paid for this old debt. They didn't do this, so they knew they weren't getting to get into housing authority. They've done absolutely nothing on their own and have been pointing the finger at everybody else and it's their problem. It's because of them that we're here, not because of Mr. Gaugler or anyone else, and they've done absolutely nothing on their own to help themselves, and made absolutely no progress in the case, and I think the goal needs to be changed for the benefit of the children.

This case has a rather storied history. The adjudication of wardship was January 14th of '99. When the salient factors the [c]ourt recalls since taking over this call[,] which was in March of 1999[,] was that for a relatively substantial period Mr. Ewing was in jail. The court, if I recall correctly, kept this thing open so that Mr. Ewing could show that he's responsible, reasonable, that he could make progress. In their wisdom the legislature has indicated that their reasonable progress from the date of adjudication is nine months. The Supreme Court recently indicated that those nine[-]month periods for that particular part of the statute would be the material portion. We have a case where we've had the adjudication over 18 months ago. We're still spinning our wheels. [Respondent's counsel] attempts to blame everybody except where the blame should be[,] which [is on] the parents it would seem to me. Mr. Ewing was testifying that no one would give [respondent] help. Well, he's the father. *** He's making $320 a week. She's making $500 per month SSI. There's been no planning whatsoever. For 18 months they've been trying to get some type of housing.

* * *

*** Neither of you have followed the case service plan nor tried to finish the things that you have [to do]. I told you two eight months ago the problem is alcohol and drugs. *** You haven't made substantial progress. You're still violen[t]. There's still homelessness. There's substance abuse. There's antisocial behavior on both sides and criminal behavior. There's failure to comply with the case service plan, Prairie Center and New Horizons, both. For those reasons I believe it's evident that the goal should be changed to substitute care pending and it shall be.

There's another point that should be made, that the children have been in substitute care *** for 20 months. One of the prime objectives of the new legislation *** was to give stability to the children. [Twenty] months is long enough to give you people time to change, and the evidence is rather clear today that the goal of return home is not workable, therefore the goal will be changed to substitute care pending court determination."

The trial court's August 28, 2000, written order articulated the court's findings, in pertinent part, as follows:

"The parents *** are unfit for reasons other than financial circumstances alone to care for, protect, train[,] or discipline the minors, and appropriate services aimed at family reunification and family preservation have been unsuccessful in rectifying the conditions which have led to such a finding of inability to care for, protect, train[,] or discipline the minors."

The court's order also stated that the court found that it was in the children's best interest that they remain wards of the court. Accordingly, the court ordered that L.H. and S.E. remain wards of the court and granted DCFS the power to place them. The court further ordered that (1) the permanency goal be changed to substitute care pending the court's decision on termination of parental rights and (2) respondent continue to cooperate with DCFS. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Respondent first argues that the trial court's order changing the permanency goal to substitute care pending the court's decision on termination of parental rights was against the manifest weight of the evidence. We disagree.

■ A trial court's determination of a permanency goal will not be reversed on appeal unless it was against the manifest weight of the evidence. *In re J.B.*, 311 Ill. App. 3d 868, 870, 726 N.E.2d 9, 11 (2000). Pursuant to section 2—28(2) of the Act, the court must set a permanency goal that is in the children's best interest, and the court's determination must include the following factors: (1) the age of the chil-

dren; (2) the options available for permanence; (3) the current placement of the children and the intent of the family regarding adoption; (4) the emotional, physical, and mental status or condition of the children; (5) the types of services previously offered and whether the services were successful and, if not successful, the reasons the services failed; (6) the availability of services currently needed and whether the services exist; and (7) the status of any siblings. 705 ILCS 405/2—28(2) (West Supp. 1999). The court also must consider (1) the permanency goal contained in the service plan, (2) the appropriateness of the services contained in the plan and whether those services have been provided, (3) whether reasonable efforts have been made by all the parties to the service plan to achieve the goal, and (4) whether the plan and goal have been achieved. 705 ILCS 405/2—28(2) (West Supp. 1999).

■ According to respondent, the record contains insufficient evidence that she was provided with adequate assistance in finding housing. Specifically, she points out that (1) the trial court received no reports enumerating the steps that had been taken to help her find housing, (2) Dickenson testified that she contacted the Danville Housing Authority only two or three times on respondent's behalf, and (3) no evidence was presented regarding the exact type of help that respondent received. Respondent further alleges that DCFS stopped assisting her in February 2001 when it decided that the permanency goal should be changed. We are not persuaded.

As the trial court pointed out, respondent had 18 months in which to make progress toward obtaining suitable housing. At the time of the August 2000 hearing, respondent was virtually no closer to obtaining housing than she had been at the outset of her case. The court need not be presented with an "enumerated" plan for it to determine that adequate services were provided. The record shows that resources were made available to respondent. In particular, a home interventionist was assigned to respondent, and Gaugler testified that on three occasions respondent was offered apartments by the Danville Housing Authority but could not take them because she did not have money for a down payment. The record also reflects that respondent was not able to begin her housing search in earnest until she had completed alcohol- and drug-abuse treatment. Respondent opted not to undergo such treatment until January 2000. Accordingly, the court's finding that respondent failed to take significant initiative despite the resources that were made available to her was not against the manifest weight of the evidence.

Respondent also contends that the weight of the evidence showed that she had made substantial progress on her service plan goals. We

disagree. Eighteen months after L.H. and S.E. were removed, respondent had not entered treatment for domestic violence and remained in a violent relationship with Ewing, evinced by the serious injury Ewing inflicted upon her just two months before the August 2000 hearing. Although she had completed a drug- and alcohol-treatment program, her attendance and participation in aftercare treatment were poor, and she was socializing with drug users. Calvert considered her to be at a high risk of relapse.

Moreover, when determining an appropriate permanency goal, the trial court is obligated to consider the children's best interest. 705 ILCS 405/2—28(2) (West Supp. 1999). At the time of the August 2000 hearing, L.H. and S.E. had been in substitute care for 20 months with a family that had expressed an interest in adopting them. S.E. was thriving, and L.H.'s academic performance was improving. Meanwhile, respondent was at a high risk of relapsing into drug and alcohol abuse and lacked adequate housing for her family. Given the minimal amount of progress respondent made over 18 months' time and her alcohol- and drug-abuse prognosis, we conclude that the court's order changing the permanency goal was not against the manifest weight of the evidence.

### B. Written Findings

■ Last, respondent argues that the trial court erred by failing to indicate in writing its reasons for changing the permanency goal as is required by section 2—28(2) of the Act. 705 ILCS 405/2—28(2) (West Supp. 1999). Section 2—28(2), in pertinent part, provides: "In selecting any permanency goal, the court shall indicate in writing the reasons the goal was selected and why the preceding goals were ruled out." 705 ILCS 405/2—28(2) (West Supp. 1999). Citing *In re K.H.*, 313 Ill. App. 3d 675, 730 N.E.2d 131 (2000), in which this court affirmed a trial court's order changing the permanency goal but remanded the cause and directed the trial court to enter written findings pursuant to section 2—28(2) of the Act, respondent urges us to remand her cause for compliance with section 2—28(2) of the Act. We decline to do so.

First, this case is distinguishable from *K.H.*, in that here, the basis for the trial court's decision is clearly shown by the court's lengthy finding and remarks on the record at the August 2000 hearing. In sum, the court cited (1) an overall lack of progress and initiative on respondent's part, (2) respondent's failure to find housing, (3) respondent's substance-abuse and domestic-violence issues, and (4) the best interest of L.H. and S.E. Given that (1) the evidence of record was more than sufficient to support the court's decision and (2) the

basis for that decision is ascertainable from the record, we hold that we need not remand this case for entry of more specific written findings.

Moreover, when the record provides an adequate basis for review of the trial court's ruling, the legislative intent underlying the writing requirement is not compromised by a decision not to remand. In light of the overwhelming volume of cases moving through the trial courts and the bare-bones support staff at the disposal of those courts, a court's oral pronouncement of its ruling should be viewed as sufficient to comply with section 2—28(2) of the Act if (1) those pronouncements appear in the record and (2) they would constitute a sufficient statement of the court's findings if the court had turned to the court reporter and requested that its oral pronouncement be typed up and printed in the form of an order. In other words, so long as something exists in the record stating the basis for the court's determination, the writing requirement should be deemed satisfied, regardless of whether the "writing" was prepared by the court reporter or the court's administrative staff.

In conclusion, we decline to remand respondent's cause for the entry of a written order in compliance with section 2—28(2) of the Act because the basis for the court's decision is readily ascertainable from the record.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT, J., concurs.

JUSTICE COOK, specially concurring:

I concur, but I am troubled by an issue not addressed by the parties.

The majority states:

> "Moreover, when determining an appropriate permanency goal, the trial court is obligated to consider the children's best interest. 705 ILCS 405/2—28(2) (West Supp. 1999). At the time of the August 2000 hearing, L.H. and S.E. had been in substitute care for 20 months with a family that had expressed an interest in adopting them." 319 Ill. App. 3d at 944.

It has been the law that, when the State seeks to terminate parental rights, the court must determine the parent's unfitness before it may proceed to a consideration of the child's best interests. *In re Adoption of Syck*, 138 Ill. 2d 255, 276, 562 N.E.2d 174, 183 (1990). It is

improper to take a child from fit parents because other individuals might do a better job raising the child. It is not until after a parent has been found to be unfit that the court may consider evidence of the child's best interests. *In re M.S.*, 302 Ill. App. 3d 998, 1003, 706 N.E.2d 524, 528 (1999). For that reason, it is necessary in termination cases to conduct a separate best interests hearing after the parent has been found to be unfit, in which evidence will be admitted which was not admissible at the fitness hearing. *In re J.T.C.*, 273 Ill. App. 3d 193, 200, 652 N.E.2d 421, 426 (1995); *In re A.P.*, 277 Ill. App. 3d 592, 600, 660 N.E.2d 1006, 1012 (1996).

Does section 2—28(2) of the Act purport to change these basic rules? Can a decision to terminate parental rights be made before it is determined that the parents are unfit? Is it no longer necessary to have a best interests hearing separate from the unfitness hearing? As far as I can tell, the statutes dealing with unfitness hearings in termination cases have not been changed. Section 4—27(2) of the Act (705 ILCS 405/4—27(2) (West 1998)) still requires a "finding, based upon clear and convincing evidence, that a non-consenting parent is an unfit person" before parental rights may be terminated. In any event, it must be remembered that the legislature does not have complete freedom to act in this area; parental rights are a fundamental liberty interest protected by the fourteenth amendment (U.S. Const., amend. XIV). *Lulay v. Lulay*, 193 Ill. 2d 455, 472, 739 N.E.2d 521, 530 (2000), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 71 L. Ed. 2d 599, 606, 102 S. Ct. 1388, 1394 (1982).